[L. A. No. 28943. In Bank. Oct. 25, 1966.]

GEORGE A. P. SIMMONS, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

George A. P. Simmons, in pro. per., for Petitioner.

F. LaMar Forshee for Respondent.

THE COURT.—This is a proceeding to review a recommendation of Disciplinary Board I of the State Bar of California that petitioner be suspended from the practice of law for two years (one year actual and the balance on probation).[1]

■ *Questions*: First. *Is the conclusion reasonably warranted that petitioner misappropriated funds of his clients?*

■ *Yes.* The burden is upon one seeking a review of a recommendation of a disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Marlowe* v. *State Bar*, 63 Cal.2d 304, 309 [8] [46 Cal.Rptr. 326, 405 P.2d 150] ; *Scofield* v. *State Bar*, 62 Cal.2d 624, 625 [2] [43 Cal.Rptr. 825, 401 P.2d 217] ; *McKinney* v. *State Bar*, 62 Cal.2d 194, 195 [2] [41 Cal.Rptr. 665, 397 P.2d 425].) ■ The record discloses, however, that petitioner has not sustained this burden.

It appears from the record that before his admission to practice law petitioner worked as a law clerk for his brother, Herbert W. Simmons, Jr. After being admitted to practice, he

---

[1] The recommendation was by a disciplinary board established pursuant to section 6086.5 of the Business and Professions Code (Stats. 1965, ch. 973, p. 2590).

continued to work for his brother as a salaried attorney, at first for $100, and later for $150, a week.

Petitioner's brother ''named'' the law office ''Simmons and Simmons'' when petitioner was admitted to practice in 1955, and petitioner knowingly operated under that name.

Early in August 1961, Mabel B. Johnson (Mrs. Edwin M. Johnson) and Lucille M. Creasy (Mrs. Fred G. Creasy) contacted the law office of Simmons and Simmons. Mrs. Johnson and Mrs. Creasy were sisters and lived in Spokane, Washington. They had a brother, Andrew J. Caldwell, who had lived in Los Angeles but died July 29, 1961.

Mr. Caldwell had married twice, his second wife being Mary Caldwell. They married November 7, 1956, and separated December 21, 1959. An interlocutory decree of divorce was granted January 7, 1960, and a final decree on January 18, 1961.

Mr. Caldwell worked for International Harvester for several years before his death. During his employment there he obtained, through the company's group insurance program, a $2,800 Aetna Life Insurance Company double indemnity policy on his life.

After Mr. Caldwell and his wife, Mary, separated, he entered into an oral contract with his sisters, Mrs. Johnson and Mrs. Creasy. By its terms, if he died they were to come to Los Angeles, arrange for his funeral, and attend to his affairs. Among other things, he agreed to make them sole beneficiaries under the Aetna insurance policy.

Mr. Caldwell later was injured in a fire and died July 29, 1961. His sisters were notified and went to Los Angeles August 1, 1961, to arrange for his funeral.

Upon learning that his divorced wife, Mary Caldwell, was the named beneficiary of his Aetna insurance policy, they decided to employ an attorney to represent them in claiming the proceeds. Since papers in their brother's apartment indicated that the firm of Simmons and Simmons had represented him in the divorce proceedings, they went to that office and met Herbert W. Simmons, Jr. Mr. Simmons agreed to represent them on a contingent basis, and they signed various papers, including one entitled ''POWER OF ATTORNEY,'' dated August 11, 1961.

The power of attorney authorized Herbert W. Simmons, Jr., to collect the proceeds of the Aetna policy and receive, endorse, and negotiate all bills of exchange received pursuant to it.

Petitioner notarized the power of attorney. The statement on it, which he signed as notary public, recited that Mabel B. Johnson and Lucille M. Creasy were known to him as the persons signing the instrument and that they had personally appeared before him August 11, 1961, and acknowledged that they executed it.

When the sisters saw Herbert W. Simmons, Jr., at the Simmons and Simmons law office, they did not meet petitioner, and Mr. Simmons did not mention his name to them.

On September 7, 1961, the claim of the sisters to the proceeds of their brother's Aetna insurance policy was settled by a written agreement. The agreement provided that the sisters would receive $2,462.50 as their share of the proceeds and that the company would distribute the $2,462.50 by issuing a check for that amount to "Mabel B. Johnson, Lucille M. Creasy and George A. P. Simmons [petitioner], their attorney."

On September 22, 1961, the company issued a draft for $2,462.50 so payable. Petitioner endorsed the draft and on September 29, 1961, deposited it in an account designated "Simmons: George A. P. Trustee 1903-04286" at the Adams and Broadway Office of United California Bank.

As a result of petitioner's personal withdrawals from the trustee account, it was overdrawn $8.75 by December 1, 1961.

Petitioner did not inform the sisters that he had received the proceeds of their claim under the Aetna policy, and he did not give them any accounting of his disposition of the money.

About February 1963 Mrs. Johnson hired a Spokane attorney, Mr. Repsold, to represent her and Mrs. Creasy in recovering the Aetna policy proceeds. Mr. Repsold, in turn, associated a Los Angeles attorney, Mr. Perry.

From about February 10, 1965, to February 24, 1965, Mrs. Johnson and Mrs. Creasy each received $1,254 (or a total of $2,508) in a series of letters from the Simmons law office. Each letter showed a copy to the Los Angeles office of the State Bar. Each letter bore petitioner's dictation marks and purported to be signed by him, but in fact none of them were.

At its hearing on October 12, 1965, the trial committee received evidence showing that petitioner (1) signed the Aetna settlement agreement in two places as "Attorney for Mabel B. Johnson and Lucille M. Creasy," one signature signifying that he "approved" the agreement; (2) endorsed

the Aetna settlement draft; (3) deposited the draft in his trust account and then withdrew and used the proceeds for his own purposes; and (4) failed to report to Mrs. Johnson and Mrs. Creasy that he had received the draft and failed to account to them, although requested, for the proceeds of the draft.

Although petitioner was personally served with notice of the trial committee hearing of October 12, 1965, and did not request a postponement, he did not appear at the hearing, and he was not represented by counsel.

The facts recited above amply support the trial committee's finding that petitioner misappropriated funds of his clients.

■ Second. *Is petitioner's "explanation" (that is, that his brother, not he himself, was culpable) persuasive?*

*No.* Petitioner's uncorroborated testimony that the Aetna settlement draft was "cashed" for his brother and that his brother received the proceeds is not, under the circumstances of this case, persuasive.

When petitioner appeared before the disciplinary board, he was questioned about why the settlement draft bore his name and the circumstances under which he endorsed it. His testimony on these important points discloses either evasiveness or a very poor memory on a matter of great importance to him.

The evidence received by the trial committee shows that petitioner endorsed the Aetna settlement draft, deposited it in his trust account, and later used the proceeds for his own purposes.

His statements before the disciplinary board concerning the alleged "cashing" of the settlement draft were not clear. At one point he said: "This check was cashed from funds which I held from someone else. I cashed it for Herbert Simmons [petitioner's brother] and gave him the cash."

At another point petitioner testified: "The money was used . . . from a Laura Brown to cash the check, the money from that check was given directly to Herbert Simmons, all of it. The check was deposited in the account, and then I paid things for Laura Brown out of that."

In response to questions from a member of the disciplinary board concerning Laura Brown, petitioner testified, as follows: "MR. HALEY: Mr. Simmons, I believe your testimony was that with respect to the Aetna check that there was sufficient money in your office or that Laura Brown had sufficient money to cash that check. A. Yes. MR. HALEY: She was a secretary? A. Oh, no, she was a real estate agent under me. I was a real

estate broker, but at this time she was in the process which she still does of buying and selling property, and this is what this was for, for purposes of buying and selling property. MR. HALEY: And she was an employee of yours at that time? A. Yes, as a real estate agent. She had nothing whatever to do with the law office at all. MR. HALEY: And the money she gave you, 2,400 plus dollars that she gave to your brother in return he gave you the check, is that my understanding? A. Well, yes, he talked to her apparently. I am not too sure about how it happened up to that point but she gave him the money for the check. She gave it to me actually in a manner of speaking, she gave it to me, I gave it to him. He gives me the check, I deposit it in the bank, and I pay her things out of the account. That is really the procedure on it."

In response to further questions from board members, petitioner testified: "MR. ROTHERT: It is your testimony that Laura Brown gave the cash equivalent of that check to your brother, and you put the check into the account? A. Yes. MR. ROTHERT: Do you know whether your brother gave you a receipt for that money? A. Gave Laura Brown a receipt for it? MR. ROTHERT: Yes. A. I doubt it. I don't know though. MR. CARLTON: That was by cash out of the trust account? A. You mean the money that she gave him? MR. CARLTON: Yes. A. I believe it was cash. . . . MR. McDONALD: . . . you say cash was paid to your brother. Does Laura Brown have $2,400 in cash floating around this office? A. Yes, she has money *in accounts.*" (Italics added.)

From the foregoing testimony, it is evident that petitioner's "explanations" of how the Aetna settlement check was allegedly "cashed" vary, and that the variations are implausible.

It is unlikely that a businesswoman would "cash" a draft for a third person, not named as a payee, in return for nothing more than a named payee's unwritten agreement to reimburse her. This, in effect, however, is petitioner's explanation of how the Aetna draft was cashed.

Petitioner never explained why his name, not his brother's, appeared as attorney of record and as payee of the Aetna settlement draft. He offered no evidence to corroborate his testimony. He further said that if his brother appeared under subpoena, he was not sure that he would testify.

Under the circumstances disclosed by the record, petitioner must have known the sisters had not received their share of the settlement funds. Yet he failed to inform them of his receipt of the funds and his knowledge of their disposition.

**Third.** *Is the recommended discipline (suspension for two years) appropriate under the facts of this case?*

*Yes.* The record supports the finding that petitioner, who had been in practice for over five years at the time of the occurrences in question, was culpable, and the offense is a serious one. The discipline recommended by the disciplinary board, suspension for two years (one year actual and the remainder on probation subject to conditions), is appropriate.

This court has held that misappropriation of funds entrusted to an attorney is a grievous breach of professional ethics and morality deserving of disbarment in the absence of extenuating circumstances. (*Resner* v. *State Bar,* 53 Cal.2d 605, 614-615 [10] [2 Cal.Rptr. 461, 349 P.2d 67]; *In re Freiburghouse,* 52 Cal.2d 514, 516 [2] [342 P.2d 1]; see also *Johnstone* v. *State Bar,* 64 Cal.2d 153, 155-156 [2] [49 Cal.Rptr. 97, 410 P.2d 617]; *Yapp* v. *State Bar,* 62 Cal.2d 809, 816 [2], 817 [7] [44 Cal.Rptr. 593, 402 P.2d 361]; *Haley* v. *State Bar,* 60 Cal.2d 404, 405 [33 Cal.Rptr. 609, 385 P.2d 1].)

It is ordered that petitioner be suspended from the practice of law for a period of two years (one year actual and the balance on probation), the order to become effective 30 days after the filing of this opinion.