[L.A. No. 29667. In Bank. June 24, 1970.]

GEORGE A. P. SIMMONS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent

**COUNSEL**

George A. P. Simmons, in pro. per., for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

## OPINION

**THE COURT**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be disbarred.

*Facts:* Petitioner was admitted to practice in this state in December 1955. He has twice been suspended from practice for misappropriation of clients' funds—November 25, 1966, for two years on conditions of probation, including actual suspension for the first year (*Simmons* v. *State Bar,* 65 Cal.2d 281 [54 Cal.Rptr. 97, 419 P.2d 161]), and March 21, 1969, for a period of four years on conditions of probation, including actual suspension for the first two years (*Simmons* v. *State Bar,* 70 Cal.2d 361 [74 Cal.Rptr. 915, 450 P.2d 291]).

██ ██  In the present proceeding, as will hereinafter appear, the evidence shows that petitioner wilfully abandoned his clients' interests in three civil cases, resulting in loss of the clients' rights or defenses. In one case, two clients (Mr. and Mrs. Mack Follings) suffered the dismissal of their complaint against three defendants, and petitioner failed to pursue their complaint against the fourth and primary defendant in a matter in which they had suffered damages of almost $50,000. In another case, three clients (Mr. Noble Coleman and Mr. and Mrs. Lawrence Coleman) suffered a default judgment in the sum of $679.80, the suspension of their drivers' licenses, and the garnishment of Lawrence Coleman's wages. In the third case, a client (Mr. Teddy Roosevelt Williams) suffered a default judgment in the sum of $1,033.98 and garnishment of his wages.

Petitioner was charged with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, 6103) during his representation of the Follings, the Colemans, and Mr. Williams, by acts of gross negligence and wilful misconduct involving moral turpitude (Bus. & Prof. Code, § 6106). His wilful omissions with respect to such clients began in 1965, continued through 1966 (after his suspension in November 1966, as well as before), and continued during the period of his actual suspension (November 25, 1966, through November 24, 1967). Furthermore, petitioner did not at any time close his law office during the period of his actual suspension just referred to; instead, he maintained the office through his mother, Nellie Simmons (who apparently had worked in his law office since his admission), and part-time secretaries.

Mrs. Simmons testified that petitioner stayed out of the office during the period of his initial suspension from November 1966 to November 1967, but petitioner stated in his testimony that he continued to practice

until late January or early February 1967, when he became too ill to do so. Even when petitioner was allegedly too ill to come to the office, he remained in contact with his mother and the office and was aware of the status of his clients' cases. In addition, there was a continuous holding out to the Follings, the Colemans, and Mr. Williams that petitioner was entitled to practice, and they continued to treat him as their attorney. He was never substituted out as counsel, and opposing counsel and the courts continued to treat him as attorney of record.

*The Follings Matter*

In 1962, Mr. Mack Follings and his wife, Lois, owned two undeveloped lots in Los Angeles. August 21, 1962, they entered into a contract with Metropolitan Builders, Inc. (hereinafter referred to as "Metropolitan"), under which Metropolitan agreed to construct two 16-unit apartment buildings. The contract required the Follings to pay $140,800 (to include a $128,000 loan from Pacific Savings & Loan Association (hereinafter referred to as "Pacific"), secured by a first deed of trust, and a $19,300 loan from Metropolitan, secured by a second deed of trust).

An escrow was opened with First Federal Escrow Corporation (hereinafter referred to as "First Federal"). Construction was later completed and the escrow closed; but, despite periodic approval by the city, as well as by Pacific, during construction, the Follings were unable to obtain an occupancy permit due to faulty construction by Metropolitan. Metropolitan refused to make the needed structural changes; and although the Follings tried to make the changes themselves, at great expense, they eventually lost their interest in the property on foreclosure by Pacific. Mr. Follings estimated their loss at $49,000.

Some time prior to 1965 and prior to the foreclosure by Pacific on its first trust deed, the Follings had apparently contacted petitioner's brother, John Simmons, who had organized a corporation, known as the Meredith Corporation, for handling real property in trouble. Mr. Follings testified that John Simmons suggested they file a lawsuit and mentioned petitioner. In February 1965, after foreclosure by Pacific, the Follings retained petitioner to represent them and paid him $1,000 by two checks of $500 each. Both checks were given by Mr. Follings to petitioner's secretary or receptionist in his office and were cashed by petitioner shortly after their receipt. According to Mr. Follings' testimony, he never had a conversation with petitioner as to how the $1,000 was to be applied.

Petitioner filed a complaint February 16, 1965, in the Los Angeles Superior Court as attorney for the Follings. The complaint named as defendants Metropolitan, Pacific, First Federal, and the City of Los

Angeles. March 25, 1965, the city's demurrer was sustained without leave to amend, and a judgment of dismissal in its favor was entered April 12, 1965. April 5, 1965, demurrers on behalf of Pacific and First Federal were sustained, but with 20 days' leave to amend the complaint. Although petitioner was present at the hearing and received notice regarding the court's action, he did not seek to amend the complaint or oppose the motion for dismissal, and an order of dismissal was entered June 7, 1965, in favor of Pacific and First Federal. Additionally, the city, Pacific, and First Federal were awarded their costs against the Follings.

Petitioner never contacted the Follings personally to inform them of the demurrers by the city, Pacific, and First Federal, the subsequent dismissals, or the award of costs against them. Although petitioner testified that in his opinion the Follings had a good lawsuit against Metropolitan, the primary defendant, the civil case file reflects no activity of any kind by petitioner with respect thereto after Metropolitan filed its answer March 25, 1965.

Mr. Follings testified that he understood from John Simmons petitioner's total fees would be $1,000 or $1,500 and that he understood from petitioner's receptionist that the fees were to cover everything. He said that when he made the second $500 payment, the receptionist told him that the $500 was to be used for depositions; but the civil case file shows, and petitioner admitted, that no depositions were ever taken.

According to testimony by the Follings, they saw petitioner only once, and that was when they came to his office to sign the complaint. It was apparently just a casual meeting, Mr. Follings testifying that although he read the complaint petitioner had prepared, petitioner did not discuss the contents with him. Both Mr. and Mrs. Follings testified that after signing the complaint, they never received any correspondence or copies of the pleadings from petitioner or his office. The only pleading they saw was a copy of the city's demurrer, which John Simmons brought to them.

Mr. Follings testified that about four or five months after signing the complaint, he went to petitioner's office to ask about the progress of the lawsuit, but that petitioner was not there. He immediately thereafter talked with petitioner on the telephone, but petitioner was extremely vague and did not give him any direct answers to his questions. Mr. Follings thereupon became discouraged, and his wife began to pursue the matter, attempting "hundreds of times" to reach petitioner. Each time she called, she would leave her name or ask if she could make an appointment to see petitioner. Petitioner, however, never returned her calls or made any appointment with her. Mrs. Follings asked for the return of the $1,000 Mr.

Follings had paid, but petitioner never repaid the $1,000 or any part thereof.

It is undisputed that petitioner received the Follings' papers from his brother and apparently used them in preparing the complaint, and that the papers were not returned to the Follings until September 1967, at which time the original contracts with Metropolitan and certain insurance papers were missing.

Petitioner's essential defense consisted of his contentions during his testimony that he never was the attorney for the Follings; that his brother, John Simmons, President of the Meredith Corporation, had retained him; that John, in doing so, was acting pursuant to a power of attorney given him by the Follings; and that he constantly kept his brother advised. Mr. Follings, however, testified that he did not have any such understanding of indirect representation and stated that if John Simmons had retained petitioner, he would not have put up the money he did.

The Follings further denied signing a power of attorney. Mr. Follings said that before the lawsuit he signed some papers which he understood to be an agreement with John Simmons "to repair the house—the building, seeing to collection of rent, trying to get the place back into condition of occupancy." No power of attorney was found in the file.

Although on direct examination John Simmons stated that he kept the Follings advised at all times as to what was going on with the lawsuit, he testified on cross-examination that "Lois and Mack Follings were actually informed at all times by the law office." In addition, he testified that after the lawsuit was filed, his only information with respect thereto came directly from the Follings.

Petitioner attempted to blame one of his part-time secretaries, Nora Chapman, for the failure to file a request for trial setting. He testified that he was sure he had asked her to file one and also that he was sure he must have reviewed the file between May 1965 and the end of the year and must have asked her why she had not filed such a request. Later, however, when asked about the efficiency of Nora Chapman, petitioner said that she was reliable and that he could not recall an occasion when she had failed to do the things she was supposed to.

Petitioner admitted that he never reviewed the Follings litigation file after January 1966. Other than the documentary evidence which shows that petitioner prepared and filed a complaint and appeared at the hearings on the demurrers, he produced nothing in this disciplinary proceeding to substantiate his performance of any other legal services on behalf of

the Follings. Admittedly, he never returned any part of the money they paid him.

*The Coleman Matter*

August 29, 1962, Noble Lee Coleman, who was living with his brother and sister-in-law, Mr. and Mrs. Lawrence Coleman, borrowed the latter's car. While he was driving it on the Long Beach Freeway, the hood of the car flew up. Because of congested traffic in the right-hand lane, Noble was forced to stop in the left-hand lane to put the hood down. Afterwards, he he was unable to start the car again; and although his lights were on, another car, owned by Howard Peltier, struck him from behind. October 23, 1963, more than a year after the accident occurred, Peltier filed suit in the Los Angeles Municipal Court for property damages to his car in the sum of $629.80, naming Noble, Lawrence, and Valorie Coleman as defendants. The Colemans were later served with copies of the summons and complaint. None of them had liability insurance.

The Colemans took the copies of the summons and complaint to petitioner at his office, and petitioner agreed to take their case for a $100 fee, to be paid in installments over the next few weeks. Petitioner filed an answer on behalf of the Colemans November 22, 1963. The case was set for trial, at the plaintiff's request, April 28, 1964, but the trial was not held on that date.

Noble Coleman appeared in court April 28, 1964, and, according to his testimony, that was the last time he ever heard from petitioner. He said that petitioner had telephoned him before the court date and told hm, "We are going to have court"; that he went to court with a witness; that the judge called the case, and he stood up, but petitioner was not there; that the judge informed him that petitioner "was having court some other place" and that "the other party was having court in some room"; that he did not know what happened, and he waited for petitioner outside the courtroom; and that petitioner came along, went into the courtroom, and then came out and said, "If you don't hear from me anymore, everything will be okay" and "Don't worry about anything in the case." Noble Coleman testified that he never heard from petitioner again and had no correspondence from anyone in petitioner's office. He said he did not know anything more about the case until his brother's wages were garnisheed in 1967.

In July 1965, at the plaintiff's request, the case had been again set for trial, this time for November 22, 1966. The request and notice of trial were served on petitioner by mail, addressed to him at his law office. October 25, 1966, this court's opinion suspending petitioner, effective November 25, 1966, was filed. Petitioner nevertheless continued as attorney of record

for the Colemans, and opposing counsel continued to serve him with notices of pleadings and orders as attorney of record.

Trial was not held November 22, 1966. Instead, by written stipulation dated November 23, 1966, petitioner agreed to a continuance to April 3, 1967 (within the period of his suspension) and waived further notice. April 3, 1967, neither the Colemans nor anyone in their behalf appeared at the trial, and judgment was ordered in favor of the plaintiff in the sum of $679.80. April 7, 1967, the plaintiff's attorney filed a memorandum of costs, which he had served by mail on petitioner, and also a change in firm name and address, which he had served on petitioner in February 1967. May 12, 1967, judgment was entered against the Colemans, and petitioner was apparently served with notice of judgment by mail addressed to him at his office.

In June 1967, the plaintiff's counsel obtained a writ of execution and obtained $84.08 for the plaintiff by garnishment on Lawrence Coleman's wages. September 22, 1967, the clerk of the municipal court notified the Department of Motor Vehicles that the judgment had not been satisfied, and November 18, 1967, the Colemans' drivers' licenses were suspended. Thereafter, the Colemans paid the judgment, and their licenses were reinstated.

Regarding their failure to appear at the trial and their default in this matter, all three Colemans testified that they were not notified of the trial date, nor were they aware of the judgment until Lawrence Coleman's wages were garnisheed in July 1967. After the garnishment, Mrs. Coleman telephoned petitioner's office and was assured by his mother that the matter would be straightened out. Petitioner's mother told Mrs. Coleman that she would contact a Mr. Garrett, who was taking over for her son while he was ill. When Mrs. Coleman asked why they had not been notified to appear in court, petitioner's mother said that it was marked on the calendar and there was a letter, but the secretary had forgotten to mail it to them. Later the same day, Mr. Garrett telephoned Mrs. Coleman and told her he would have everything straightened out and have her husband's check released. The check not being released, however, Mrs. Coleman again called petitioner's office, indicating to petitioner's mother that she might take the matter up with the State Bar. A few days later, Mr. Garrett telephoned Mrs. Coleman after apparently talking with petitioner's mother. He seemed a little angry and told her, "Don't drag my name into this about the Bar because I don't know anything about this case. I was only trying to help you." Mrs. Coleman again called petitioner's office and was told by petitioner's mother not to worry, as she would see that Mr. Coleman's check was released. Mrs. Coleman had no further conversation with petitioner's mother

or Mr. Garrett, and the Colemans arranged with the plaintiff's attorney to pay the judgment.

Petitioner testified that he telephoned the Colemans the evening of November 22, 1966, to find out why they had not appeared in court; that they told him they had not noticed the date; and that he told them the new trial date. However, when questioned further, petitioner admitted that he did not tell the Colemans of his suspension (beginning within four days) or advise them to get another attorney. Petitioner also claimed that a letter was later sent by his secretary, Nora Chapman, reminding the Colemans of the court date, but no copy of such a letter appeared in the file turned over to Mr. Garrett.

*The Williams Matter*

In 1965, Mr. Teddy Roosevelt Williams retained petitioner to defend him in a suit filed against him by General Insurance Company of America, his landlord's insurer. The suit was for damages in the sum of $1,033.98 resulting from a fire in the apartment occupied by Mr. Williams. Mr. Williams testified that he was at work when the fire occurred; that he was working the swing shift that day from 3 p.m. to 11 p.m.; that about 10 p.m. he received a call at work from a neighbor that his apartment was on fire; that he believed the fire started from an extension cord which the landlord had installed, and which had been there when he moved in (the cord ran "from the closet, in the ceiling, under the rug, under the couch, over to the other side of the wall where the other floor light connected onto it"); and that whenever he had talked with the manager, he had warned that the cord was a fire hazard, but neither the manager nor the landlord did anything about it. The fire apparently started in the area where the extension cord ran under the couch.

The complaint for damages against Mr. Williams was filed in the Los Angeles Municipal Court August 13, 1965. Before it was filed, Mr. Williams, having received a threatening letter from the insurance company, had contacted petitioner's office. At that time, he paid $25 as a retainer fee. Upon receiving a copy of the summons and complaint, he took them to petitioner's office. Petitioner was not there, but Mr. Williams talked with petitioner's mother, who "explained the case" to him and assured him "that the attorney would get in touch with [him]." Later, petitioner filed an answer in Mr. Williams' behalf, and Mr. Williams paid a $5 fee for filing the answer. Under their agreement, Mr. Williams was to pay petitioner a $200 fee for his legal services, payable $25 a month. He ultimately paid a total of $150.

In September 1965, at the request of the plaintiff's counsel, with notice to petitioner, the trial was set for February 9, 1967. On that date, trial was

continued to April 20, 1967, and notice was given to petitioner. (It will be recalled that petitioner had been suspended, effective November 25, 1966.) Trial was held April 20, 1967, but Mr. Williams did not appear, and no one appeared on his behalf. As a result, a default judgment was rendered against Mr. Williams in the sum of $1,033.98. April 20, 1967, the plaintiff's counsel gave petitioner, as attorney of record, notice of the default against Mr. Williams. Also, in April 1967 counsel served petitioner by mail with the plaintiff's memorandum of costs. June 23, 1967, the clerk of the municipal court gave petitioner notice of the entry of judgment against Mr. Williams.

Mr. Williams testified that he received no notice or other communication from petitioner's office with regard to the trial date, or any other aspect of the case, after he left the papers at petitioner's office, except for an occasional reminder that he was delinquent in his installment payments on the fee. In petitioner's office file, there was a copy of a purported letter to Mr. Williams from petitioner's secretary, Nora Chapman (who did not testify in the disciplinary proceeding), notifying him of the April 20 trial date and advising him that he would have to obtain other counsel. Mr. Williams testified, however, that he never received the letter, that he had lived at the same address for 11 years, and that he had never missed any mail or had his locked mail box tampered with.

Mr. Williams testified that he first learned of the judgment against him when $91.70 of his wages were garnisheed in July 1967. After learning of the judgment, he tried to contact petitioner, but found no one at his office after repeated attempts. He later arranged to pay the judgment on an installment basis.

The testimony of petitioner's mother with respect to the Williams matter is confusing and at times internally conflicting. For instance, she first testified that she called Mr. Williams "many times" regarding the new trial date. She then testified, "No, I didn't call him a number of times. . . . I presume one time." Later, she testified that the principal purpose of the telephone calls was to remind him he was delinquent in his installments and that notice of the trial date was "noted" on his collection statements. From petitioner's own testimony, it is clear that he was not concerned about the status of Mr. Williams' case. He said that he "had no actual knowledge as to whether or not notice was sent, [or] whether he [Mr. Williams] got a notice or not. . . ."

*Questions: First. Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.* ■ The burden is upon one seeking a review of a recommendation of the disciplinary board to show that its findings are not supported by

the evidence or that its recommendation is erroneous or unlawful. (*Eschwig v. State Bar,* 1 Cal.3d 8, 15 (2) [81 Cal.Rptr. 352, 459 P.2d 904].) In the present case, however, it is clear from the facts set forth above that petitioner has not met this burden.

■ Second. *Is disbarment warranted under the facts of this case?*

*Yes.* ■ Gross carelessness and negligence constitute a violation of the oath of an attorney to discharge faithfully the duties of an attorney to the best of his knowledge and ability and involve moral turpitude, in that they are a breach of the fiduciary relation which binds him to the most conscientious fidelity to his clients' interests. (*Stephens* v. *State Bar,* 19 Cal.2d 580, 582-583 [122 P.2d 549]; *Bruns* v. *State Bar,* 18 Cal.2d 667, 672 [3] [117 P.2d 327]; see also *Rock* v. *State Bar,* 57 Cal.2d 639 [21 Cal.Rptr. 572, 371 P.2d 308, 96 A.L.R.2d 818].)

In a recent disbarment case, *Grove* v. *State Bar,* 66 Cal.2d 680, this court said at pages 683-685 [2, 1b] [58 Cal.Rptr. 564, 427 P.2d 164]: "Habitual disregard by an attorney of the interests of clients is ground for disbarment under Business and Professions Code sections 6103 and 6106. Even when such neglect is grossly negligent or careless, rather than willful and dishonest, it is an act of moral turpitude and professional misconduct, justifying disbarment. . . .

". . . . . . . . . . . .

". . . [O]ur duty lies in the assurance that the public will be protected in the performance of the high duties of the attorney rather than in an analysis of the reasons for his delinquency. Our primary concern must be the fulfillment of proper professional standards, whatever the unfortunate cause, emotional or otherwise, for the attorney's failure to do so."

■ The evidence herein discloses a common pattern in the three matters investigated, that is, petitioner's acceptance of fees followed by his failure to communicate or deal directly with his clients regarding their cases, his refusal to respond to their inquiries (he was invariably "out" when they telephoned or sought to see him, and requests to have him return their calls were ignored), and his failure to advise them at any time that they should obtain other cousel or to give them any kind of notice to prevent the consequences of defaults in two matters and failure to prosecute in the other. The official court files show that at all times petitioner had notice of the status of the cases; but he took no steps for the protection of his clients,[1]

---

[1]The following excerpts from petitioner's testimony concerning the procedures employed by him allegedly to give notice to Mr. Williams and the Colemans are illustrative of his conduct:

"Q. Did you ever telephone or try to telephone Mr. Williams about the fact that

and during his suspension he held himself out to opposing counsel and the courts as attorney of record. Thus, petitioner not only failed to give notice

you had been suspended and he would have to get another attorney?

"A. No.

"Q. You never did?

"A. No.

"Q. Did you ever sign any letter that was typed up over your signature notifying him of the fact that his trial was set for April 20 of 1967 and that he should get another lawyer?

"A. I don't think so.

"Q. Then apparently you left this up to your secretary to take care of it?

"A. That is correct.

"         .         .         .         .         .         .         .         .         .         .         .

"MR MILLER: Did you have some kind of a form?

"A. Yes. . . .

"MR. MILLER: And who did you give this form to?

"A. I think it was Nora. I am not too sure.

"         .         .         .         .         .         .         .         .         .         .         .

"MR. MILLER: Well, in connection with the Teddy Williams matter, did you have any discussion with Mrs. Chapman as to whether he had responded to the advice to him that the case had been set for trial and that he should obtain another attorney?

"A. No, but I did have discussion with Mrs. Simmons, Nellie Simmons, about it.

"         .         .         .         .         .         .         .         .         .         .         .

"MR. MILLER: Did you discuss with her the form in which the notice had been given to Mr. Williams?

"A. No, I didn't.

"MR. MILLER: Did she mention whether she had done anything other than talk to him on the telephone?

"A. Yes, she did. She sent him a notice.

"MR. MILLER: Did she tell you what kind of a notice?

"A. No.

"MR. MILLER: Was she in the practice, during that period of time, of sending out these forms that you had authorized advising people of the fact that you were not practicing and that they should obtain another attorney?

"A. No, she doesn't type that well.

"MR. MILLER: What type of a notice did you think she had given then?

"A. Well, she had given notices before on these envelopes. I had seen her do this. I've seen her type out statements on a piece of paper, oh, I've seen her do any number of things but I never saw her sit down and type out a letter.

"         .         .         .         .         .         .         .         .         .         .         .

"MR. MILLER: Do you have any explanation at this time with regard to the Coleman matter as to why you didn't notify opposing counsel that you were not able to represent the Colemans?

"A. The only thing I can think of is the notice had been sent to them. As I say, during this period of time I was not operating I did the best I could but I couldn't go into court and I was not able to go in the office every day. I had to rely on other people to help me.

"MR. MILLER: The other people being Nora Chapman and your mother, Nellie Simmons; is that right?

"A. And other attorneys.

"MR. MILLER: Do you recall whether you contacted the Coleman matter to—

"A. Personally, no.

"MR. MILLER: Well, with regard to whether or not you contacted the court in any particular case that you were not able to represent your clients, do you have any

to his clients, but also effectively prevented them from receiving notice from others.

■ Petitioner's prior record may properly be considered in determining the appropriate discipline. (*Eschwig* v. *State Bar, supra,* 1 Cal.3d 8, 18 (12).) As hereinabove indicated, in the past three and a half years petitioner has twice been suspended from practice for misappropriation of clients' funds. (*Simmons* v. *State Bar, supra,* 65 Cal.2d 281; *Simmons* v. *State Bar, supra,* 70 Cal.2d 361.) In the last proceeding, the initial recommendation, made by former Disciplinary Board I, was for disbarment. Subsequently, the single disciplinary board which meanwhile had replaced former Disciplinary Board I, recommended that petitioner be suspended for a period of four years (two years actual and the balance on probation), and that is the discipline which was imposed.

Under the circumstances herein disclosed, particularly in view of petitioner's previous record of misconduct, his abdication of his duties to his clients as revealed in the present matter warrants the conclusion that he is not entitled to be recommended to the public as worthy of trust.

---

recollection now of any criteria that you used as to whether you contacted the court in any particular instance or not?

"A. No, not really. It depended upon the status of the situation at that time. You know, it doesn't say anything but this is the way it was.

"MR. MILLER: *Do I understand you then that you had no, shall we call it, standard operating procedure that you used in this regard?*

"A. *That is about it because things were handled by so many different people in so many different ways* and, as I say, that this Coleman matter and the Williams matter were not the only things that mistakes were made on but when mistakes were made I would do whatever I could to rectify them. All these mistakes had been rectified except these two and the reason these two were not, as I understand it, is that the Colemans just plainly wouldn't cooperate with anybody after it was done and Williams, apparently because he hadn't paid, he wouldn't cooperate. I don't know but there were other judgments that were taken and these judgments were set aside.

"MR. MILLER: Just so I can get your position clear in my own mind here, is it your position that in some instances that there were errors and mistakes that were made that you couldn't prevent and that, for instance, in the Coleman case that is one of them?

"A. That is right, and when it happened, why, I would immediately do what I could to take care of the situation.

"MR. MILLER: In your way of thinking, what was [*sic*] the mistakes that were made in the Coleman matter?

"A. *I don't know because, again, I am relying upon someone else telling me that notices were sent, people saying they didn't get the notices, so I don't really know whether the notice was sent out or not.* So in this type of case, when this happens and the person says they didn't get the notice, I take them at face value. They said they didn't get the notice so, therefore, I do take the necessary steps to protect them." (Italics added.)

■

It is ordered that petitioner be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys effective 30 days from the filing of the court's opinion.