[L. A. Nos. 15249, 15433. In Bank.—December 23, 1935.]

GEORGE C. JOHNSON, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

George C. Johnson, *in pro. per.,* for Petitioner.

Philbrick McCoy for Respondent.

THOMPSON, J.—Two disciplinary proceedings were instituted against the petitioner, the first notice to show cause, setting forth that he had violated rule 2 of the Rules of Professional Conduct of The State Bar, and his oath and duty as an attorney at law, within the meaning of subdivision 2 of section 287 of the Code of Civil Procedure, and the second asserting that petitioner had violated rules 3, 4 and 7 of the Rules of Professional Conduct, as well as subdivisions 2 and 5 of section 287 of the Code of Civil Procedure.

Local administrative committee No. 3 found that petitioner had offended against the rule and the subdivision of the code section, as set out in the first notice to show cause, and had also violated subdivision 5 of the same section. It recommends his disbarment. However, the Board of Governors reduced its recommendation to suspension for one year. With respect to the second charge, local administrative committee No. 8 recommended that petitioner be suspended for two years, which was approved and adopted by the Board of Governors. We have issued writs of review in both proceedings, at the instance of petitioner, for the purpose of determining whether the recommendation of the board should be adopted and, while we deem it appropriate to consider both proceedings in one opinion, we shall, in the interest of clarity, detail separately the facts as disclosed by the record. Hence, we turn at this juncture to the record which respondent says supports the first charges.

It appears that in the early part of 1934, petitioner prepared, in part at least, and mailed or caused to be mailed to from between five hundred and one thousand lawyers throughout the United States, the following circular:

"Mortgage Adjustment & Salvage Company
"408 South Spring St.,
"Los Angeles, California.

"Dear Sir:

"This circular is as unusual as is the offer herein made to you.

"You personally know several persons who have 'lost' or are 'about to lose' their properties through foreclosure. We

are launching a nationwide campaign of buying certain properties, and offer you the opportunity to share with us thru the attached contract.

"This panic has created the almost unbelievable situation that certain mortgages and trust deeds are invalid and unenforceable. The United States Constitution, the Acts of Congress, court decisions, and the acts of the President all contribute to this conclusion. We have the legal opinion of George C. Johnson, lawyer, of Los Angeles, and we are fully convinced, that the proposition is sound and that if attacked in court it will stand the final test. The idea also will have popular support, and it may be the next national campaign issue.

"George C. Johnson, LLB Northwestern University, is a member of the California, Texas and Illinois bars. In 1914, at the request of General Funston, the War Department sent him to Vera Cruz, Mexico, with General Funston's Chief Staff to handle matters there for the War Department during the American occupation. In 1914 Dean John Henry Wigmore of Northwestern University and the Judge Advocate Department wrote the 1914 Army Courts-Martial Manual, and supplementing it Mr. Johnson wrote a memorandum Courts-Martial Procedure, many hundred thousands copies of which were used by the Army Courts as authority on procedure. In 1922 Mr. Johnson assisted the Mexican government to secure recognition by the United States government. In 1925 he was associated with the General Counsel for the American Bankers' Association and salvaged several large corporations for eastern banks. In 1926, he liquidated assets of Equitable Trust Company, in Missouri and Texas, involving titles to some 4,000 pieces of realty, and in connection therewith filed one suit in San Antonio, Texas, against approximately 1,000 defendants. In 1931, in *Re Weeks Poultry Community, Inc.*, 51 Fed. (2d) 122, he established new law in California, that co-operative marketing associations are not amenable to the Bankruptcy Act. In 1934, in action No. 318,472, in the Superior Court of Los Angeles County, he established new procedure in that a judgment debtor, by merely hiding in his home, can be arrested for absconding, and also that a receiver can be appointed for a judgment debtor corporation. We believe Mr. Johnson is again right in the above proposition and

we are so convinced of it that we are sending you this proposition thru the mail.

"This offer is open for ten days. You will not be required to make any purchase or do any act of which you yourself do not first approve. To assure your good faith in your own work, we must have the right to require you to assign your interest later if the specific asset becomes involved in court action, or that you advance the court costs to retain it, which should not aggregate more than $25.00 a suit.

"If interested, fill in the plan desired and sign the contract and mail it to us with U. S. Postal Money Order. Do not send bank checks. A duplicate signed contract, the plan and brief will be mailed you in the rotation the contracts are received. You will also receive free a copy of Mr. Johnson's analysis of the cause and cure of the panic, which will be of inestimable value to you.

"This is the big opportunity for lawyers to rehabilitate themselves.

"Very truly yours,

"MORTGAGE ADJUSTMENT & SALVAGE COMPANY."

"AGREEMENT, made at Los Angeles, California, this —— day of ——, 1934, by and between MORTGAGE ADJUSTMENT & SALVAGE COMPANY, hereinafter called the client, and ——, whose address and name appears on the reverse side hereof, hereinafter called the attorney.

"1. Said client, hereby retains and employs said attorney to act as such exclusively for said client to purchase certain properties under the direction of said client as outlined in certain plans of operation to be forwarded said attorney and to prosecute and defend any and all actions to final adjustment that may arise in connection therewith.

"2. It is understood and agreed that all purchases and court proceedings shall be subject to the approval of said attorney; that the client will lend to said attorney the plans of operation and the legal opinion of its general counsel George C. Johnson to assist said attorney and that said attorney need make no purchase nor take any legal action of which he himself does not approve.

"3. In view of the fact that the client will operate this business throughout several states and that the ultimate financial success of said business depends largely upon keeping the plan

and the legal theory secret so as to enable said client to obtain advantageous purchase contracts and because thereof it will be impracticable. or extremely difficult to fix the actual damages for a breach of this contract, it is agreed that in case said attorney, without the written consent of said client, discloses to any person, firm, corporation or court, the plan or any part thereof or the theory or the law under which the client is operating, or permits the same to be stolen or lost, that $50,000 shall be presumed to be the amount of damage sustained by said client by reason of said breach of this agreement.

"4. Said attorney will not be required to advance any purchase money, but to assure his good faith in recommending purchases that will not become involved in court litigation, he may be required personally to advance the court costs and expenses and the briefs on appeal, as, if and when necessary, or to assign his interest in said specific property in lieu thereof.

"5. Title to all properties purchased shall be taken in the name of said client and the percentages thereof that is to be paid said attorney for his services from the final sale shall be held by said client in trust for said attorney until sale thereof and the proceeds on each sale shall be divided, as, if and when received, after deduction of all costs, expenses, advancements, carrying and maintenance charges, etc., (1) 50% to client and 50% to attorney, if attorney pays $5.00 herewith for use of said plans and briefs; (2) 60% to attorney and 40% to client, if attorney pays $10.00 herewith for use of said plans and briefs; (3) 70% to attorney and 30% to client, if attorney pays $50.00 herewith for use of said plans and briefs; (4) 80% to attorney and 20% to client, if attorney pays $100.00 herewith for use of said plans and briefs; (5) 90% to attorney and 10% to client if attorney pays $200.00 herewith for use of said plans and briefs; provided, however, that if said attorney after receiving said plans and briefs desires to change his percentage he may do so by paying within ten days after receipt of said plans and briefs double said amounts for the stated desired percentage.

"6. Said attorney hereby accepts said employment and agrees to render such services as attorney on the terms and conditions set forth under plan —— above and encloses here-

with Postal Money Order, dated ——, 1934, at ——, State of
——, for $——.   Signed in duplicate.
.  "MORTGAGE ADJUSTMENT & SALVAGE COMPANY,
                                        "Client.

———————————————,
                                "Attorney."

Petitioner claims that he was employed by the Mortgage
Adjustment and Salvage Company, and specifically by one
A. M. Wood, to advise concerning the validity of mortgages
and trust deeds, and was instructed by Wood to send out the
circulars.   However, his own testimony very clearly indicates
that he did not know whether there was such a company as the
Mortgage Adjustment and Salvage Company; that it had no
office at 408 South Spring Street, Los Angeles, which address
was, in fact, his own office; that he gave instructions that
mail directed to the company at the number mentioned was to
be delivered to his office; that he arranged "to answer any
inquiries with reference to employment and advise" Wood of
the results; that his wife ordered the circulars to be printed
and addressed and mailed them from his office; and that one
return enclosing a postal money order for $5 was received,
which the petitioner cashed and retained until, when, after an
investigation was started by The State Bar, he says he advised
Mr. Wood that the response was insufficient to warrant pro-
ceeding further with the plan and returned the money to the
sender.   We should also observe that Mr. Wood was not
called as a witness, nor was it sought to take his testimony.
Also, the administrative committee found that during the
hearing many of the answers of petitioner were "evasive" and
"non-responsive, strongly indicating an intention on the part
of the respondent to conceal from the committee the true
facts, that during the hearing of this cause respondent ex-
hibited disrespect to the Committee and expressed a con-
tumelious attitude . . . "   Even the cold type of the record is
sufficient in this case to support this finding and statement of
the committee.

The petitioner asserts that the evidence is insufficient to
support the conclusion that he was engaged in the solicitation
of business.   He also argues that, if advertising and solicita-
tion were engaged in by him, it was done outside of the state
of California, for which reason The State Bar has no juris-
diction.   Further, he says that inasmuch as the proceeding

was criminal, he could not be compelled to testify against himself, and that he was not accorded the protection ordinarily extended to one accused of crime.

Dealing with the contentions in their order, we have no hesitancy in declaring that the testimony herein impresses us with the conviction that petitioner conceived and attempted to put into execution the plan or scheme outlined in the circular. Separating the testimony to the effect that petitioner was employed by a Mr. A. M. Wood from the other facts above recited, no one could have the least doubt that he made use of a fictitious name for the purpose of concealing his own identity while writing and circulating for himself a very fulsome testimonial of ability and experience. Nor are we inclined to give a great deal of consideration to the testimony concerning Wood. It fails, under the circumstances of this case, to carry conviction. And, even though petitioner had been employed by Wood to give advice concerning mortgages and trust deeds, the fact remains that it was petitioner who carried the plans into execution, in so far as having the circulars printed and mailed.

With respect to the claim that the advertising or solicitation was not done in this state, this argument overlooks the reason and purpose of disciplinary proceedings. It is primarily to keep the profession clean and wholesome and to limit the actions of the members of the bar within such bounds that it will have and merit the respect and confidence of the public. The petitioner was a member of the bar in this state. The acts were performed in this state. If petitioner, by his acts here, evidenced that he was lacking in that regard for his profession and the rules of conduct which have been adopted for its government, then it is here where action must be taken to discipline the petitioner and perhaps to remove him, temporarily at least, from the profession.

The last argument has been so frequently passed upon that we feel called upon to do no more than say that there are numerous authorities in the books establishing the proposition that a disciplinary proceeding is not governed by the procedural rules appertaining to the trial of one accused of a criminal offense. It has frequently been held that a member of the profession may be called upon to testify, even though such testimony may establish his violation of his oath of office and his duty as an attorney at law.

■ We have heretofore had occasion to comment upon the impropriety of efforts made to present to this court character testimonials and evidence of professional activities. (See, also, *Allen* v. *State Bar*, 218 Cal. 19 [21 Pac. (2d) 107], and *Shaeffer* v. *State Bar*, 220 Cal. 681 [32 Pac. (2d) 140].) Without the introduction of such evidence before either the administrative committee or the state board, but in disregard of the statutory rule therein announced, the petitioner has gone outside the record. to recite in fifteen pages his life history. He has devoted some seventy other pages to testimonials of character and activities and evidence thereof, and another twelve to an attack upon The State Bar and its methods. Not being a part of the record, they are improperly before us; cause an unnecessary amount of work; and, by the very manner of their attempted presentation, almost of necessity cause us to doubt the good faith of the petitioner. We reiterate the statement that such evidence may be altogether proper but, in order to be considered, it must be presented to the body to which has been delegated the responsibility of taking testimony in disciplinary proceedings, in order that witnesses may be cross-examined and counter-evidence offered.

The second proceeding involves a different state of facts. It appears from the record therein that prior to September 2, 1934, Mr. and Mrs. Ed. J. Swartout owned an apartment house located at 1920 and 1922 Harcourt Avenue, Los Angeles, subject to an encumbrance approximating $8,000, which obligation the Swartouts had guaranteed. On September 2d, an advertisement appeared in the classified section of a Los Angeles daily newspaper, reading as follows:

"Will pay cash for your equity in income property threatened with foreclosure. Box V42 Times."

Mr. and Mrs. Swartout responded thereto. A couple of days later a Mr. Bliss, in company with a Miss Bock, called upon the Swartouts. The testimony with respect to what ensued is in conflict. Mr. and Mrs. Swartout testified that Bliss told them that they had a lawyer from Texas who was a fighter and that they would endeavor to save them money and would do it for one-half of what they saved. Mrs. Swartout said that Miss Bock informed her that she had placed her property in the hands of Bliss' company and that, as a result, was not worrying about it. Mr. Bliss testified that he inquired concerning the mortgage and the income and told them that

the income was too low to interest him in the property. He testified, however, that he did tell them that a Mr. Zettler had a plan whereby he could work it out. The Swartouts testified that they then and there agreed to meet Bliss on Friday, at Fourth and Spring Streets, for the purpose of being introduced to the lawyer. Bliss testified that no such appointment was then made, but that the Swartouts contacted him by telephone later and made the appointment. The fact remains that on Friday they met Bliss, who took them to Johnson's office and introduced them to petitioner and also to Mr. Zettler, who was an employee of Bliss. Mr. and Mrs. Swartout explained that they were being foreclosed. Nothing much else was done except that petitioner informed them that he would look it up and make an appointment for them to meet him the next morning at 11:00 A. M. They met Saturday, September 8th, at about 11. Besides Mr. and Mrs. Swartout, there were present the petitioner, Mr. Zettler and a Miss Zettler. Mr. Johnson was in the outer office. Petitioner informed the Swartouts that he had bad news for them; that they had been sued on the guaranty and judgment had been rendered against them for approximately $8,000. According to the testimony of Mr. and Mrs. Swartout, he said that their car, bank account, and other property were liable and that they had better draw the money out of the bank, hide the car and otherwise protect their property. Petitioner denied this testimony, other than to concede he had discovered that this judgment had been rendered against the Swartouts personally. Petitioner in effect advised them that the gold clause in the trust deed was contrary to public policy and, therefore, void, and for that reason they should appeal from the judgment. He then proceeded to draft two contracts, the substance of which follows:

The first contract, between Celesta A. Zettler and the Swartouts recited the ownership of the Harcourt Avenue property by the Swartouts and the ownership of the West 37th Street property by Mrs. Swartout as her separate property, the judgment lien thereon, and provided for the conveyance of the Harcourt Avenue property to Miss Zettler, without warranty of any kind, the Swartouts to receive a one-third interest in any proceeds of the property, the parties to retain the Wm. M. Bliss Co., at 682 S. Alvarado St., as agents to manage and collect the rents on the West 37th Street place,

one-half thereof, after deduction of expenses, to be paid to Johnson "as and for his attorney fees of $100" for handling the appeal from the judgment on the guaranty, and also to handle the personal property of the Swartouts still remaining in the Harcourt Avenue apartments. The Swartouts further agreed that the $100 to be paid to Johnson out of their share of the rent from the West 37th Street property should be in addition to their proportionate share of court costs and expenses.

The parties to the second agreement were Celesta A. Zettler, Bliss, the Swartouts and Johnson. It recited ownership of the Harcourt Avenue property by Miss Zettler, her agreement to pay the Swartouts one-third of all proceeds recovered therefrom and provides for the employment of Johnson on a contingent basis for a one-third interest in the real property, the value of which is therein agreed to be less than $100; that the Bliss company should manage the realty, collecting all rents and paying taxes and operating bills, the revenue to be banked and applied to operating costs, court costs, to maintain a fund of $100 to protect the property in litigation, the net profits to be divided monthly between Miss Zettler, the Swartouts and Johnson, the compensation of the Bliss company to be paid by Miss Zettler.

With respect to the West 37th Street property separately owned by Mrs. Swartout, the terms fixed by the agreement are again set out.

Petitioner also drew the grant deed mentioned in the contracts. Mr. and Mrs. Swartout testified that Mrs. Swartout said she did not want to sign the contracts until she could talk them over with her son, but that petitioner told them they would not have time; that he was going to be out of the city on Monday and that they wanted to file the appeal on Tuesday. Upon this statement, they signed. Petitioner also denied having made the statement, saying that he became discouraged over their whispering together and told them to sign them, if they wanted to, later. He did admit, however, that he told them that if he took the appeal he wanted to work on it immediately. Zettler, however, remembered that Mrs. Swartout said something about preferring to have her son see them and that it was pointed out to her by Johnson that Monday was a holiday and that he expected to be out of the

county somewhere, and that if it was not signed then, it would have to go over until the last of the next week.

Mr. and Mrs. Swartout thought the matter over on Sunday and determined they did not want to go ahead. On Monday, September 10th, according to their testimony, acting on the assumption that Johnson was out of the city, they went to the office of Bliss & Company and left word for Zettler to come to their place. He came and they informed him that they did not want to go ahead; that they were willing to pay Johnson for the work he had done; that they thought $25 was sufficient, but they did not desire to appeal. They testified that Zettler was agreeable and called up the petitioner, who, Zettler reported, thought $100 for each of them ought to be "about right". Swartout then called Johnson and said he wanted the appeal stopped, to which Johnson replied, "I have got the contract and your name on it and I am going to live up to it unless I have that in writing." On September 13th, Mr. and Mrs. Swartout addressed and sent by registered mail to petitioner and to Zettler instructions to stop all proceedings in which their names were connected; saying that the mortgagee had made a liberal concession; and to return all their papers; and offering to compensate them to the best of their ability. However, the petitioner went ahead. The record does not reveal when the notice of appeal was filed, although it does appear that the last day for such action was September 22, 1934. The transcript was filed on that date and the opening brief on October 17, 1934. While petitioner in his testimony asserts that he prepared the brief within a day or two and gave it to Mr. Zettler, who caused it to be printed and filed, the record discloses two letters written by Johnson, one on October 1st and the other on October 12th, in the first of which petitioner advised the Swartouts that it would be necessary to print the abstract of the record and the brief and asking them to send in the rents to cover his fee and the costs, and in the latter demanding that they pay his fee promptly or he would "attach and collect". In the second letter he also said: "The brief will be ready by Monday" and demanded $20 to pay for its printing. On October 11th, however, a lawyer named J. Wesley Cupp, advised petitioner by letter that he had been substituted as counsel for the Swartouts, asking that the substitution be signed by Johnson, and demanding a reconveyance of the

property. Petitioner refused to sign the substitution but, as we have seen, proceeded with the appeal. Subsequently, the superior court made an order of substitution and, on stipulation of the parties, the appeal was dismissed.

We ought now to relate another feature. Prior to June 27, 1934, Mr. and Mrs. Swartout had made application to the Home Loan Corporation for a loan to refinance the Harcourt Avenue property, but their application had dragged along without being either rejected or accepted. They were served with summons on that date and immediately took it to the office of the Home Loan Corporation and talked to a gentleman named Hopkins. Mr. Hopkins called a Mr. Harkness, of the mortgage company, on the telephone and told Harkness that they were ''pushing this through under orders from Washington''. Mr. Hopkins, after the conversation, told Mr. and Mrs. Swartout that they could go home and forget it. On the basis of this conversation, the judgment rendered against them was set aside, on the theory that they were guilty of excusable neglect. This result was accomplished through the services of Mr. Cupp. The petitioner's appeal was based solely upon his contention that the gold clause of the obligation rendered it invalid.

It should also be noted that petitioner conceded he was handling another similar transaction for Mr. Zettler and further that Mr. Bliss and Zettler, while charged with collecting the rents, and who were to receive one-third of the real property from Celesta Zettler (they being unable to take title by reason of judgments against them) would, if they realized anything out of the property, receive their share as the result of ''every dollar'' having been ''salvaged by'' him. He asserts, however, that Zettler was to advance costs, but this is very patently contrary to the written agreements.

Another item which throws light upon the mental operations of petitioner is his frank declaration at the hearing that he had ''left a fortune behind in the name of a client'' and he did not ''intend to leave the title in this client''. Mrs. Swartout, in her testimony, put a different complexion on the affair by relating a remark said to have been made by Johnson to the effect ''that lawyers were not allowed to advertise and he had to do something to pay office rent and stenographer''.

The petitioner contends (1) that this court has no jurisdiction of this proceeding; (2) that the State Bar Act is

unconstitutional; (3) that the evidence is insufficient to warrant his suspension; (4) that four of the justices of this court are disqualified because they counseled with State Bar representatives in reference to the rules of professional conduct, aided in the formation of The State Bar, and are members thereof; (5) that petitioner is entitled to and demands a jury trial; and (6), that the right to practice law is a property right of which he may not be deprived without due process of law.

With respect to the first, second, fifth and sixth grounds urged by petitioner, it is unnecessary to go to great lengths to demonstrate that they are without merit. ■ This court has too many times determined that it had jurisdiction of disciplinary proceedings and that The State Bar acted merely as an arm of the court, for the purpose of taking evidence and making its recommendations, to warrant the assumption that such a contention advances an argument worthy of serious consideration. (See *Herron* v. *State Bar,* 212 Cal. 196 [298 Pac. 474].) The fact that the method provided for in the State Bar Act is "alternative and cumulative", as stated in the case referred to, disposes of petitioner's contention that the superior court has exclusive original jurisdiction. Aside from what has just been said is the fact, as recently announced by us in *In re Lavine,* 2 Cal. (2d) 324, at 329 [41 Pac. (2d) 161], that this court is clothed with the inherent power, subject to such reasonable and minimum restrictions as the legislature may prescribe, to determine who shall be officers of the court.

■ .With respect to the constitutionality of the act, petitioner says it is unconstitutional, without the citation of authority or an argument other than an attack upon the methods of The State Bar. It is a rule, well settled, that such a presentation of the subject is insufficient to require us to pass upon the points suggested. However, it is to be noted that the constitutionality of the act was thoroughly considered and discussed and decided contrary to petitioner's contention in the case of *State Bar* v. *Superior Court,* 207 Cal. 323 [278 Pac. 432]. ■ The fifth contention likewise must be determined against him upon a well-recognized rule. The specific question was ruled upon in the case of *In re Wharton,* 114 Cal. 367, 370 [46 Pac. 172, 55 Am. St. Rep. 72], and there are numerous statements to the general effect that disbar-

ment proceedings are peculiar to themselves. (See *Matter of Danford,* 157 Cal. 425 [108 Pac. 322] ; *In re Vaughan,* 189 Cal. 491 [209 Pac. 353, 24 A. L. R. 858], and cases there cited.) *Herron* v. *State Bar, supra,* and its supporting authorities, conclude the suggestion that petitioner has been denied due process of law.

██ Concerning the argument that the evidence is insufficient to warrant the discipline of petitioner, it is unnecessary to repeat by way of argument the testimony which we have recited in detail. Therefrom it appears that petitioner, contrary to the instructions of Mr. and Mrs. Swartout, his clients and the only persons against whom the judgment ran, persisted in perfecting an appeal and continuing litigation without real merit, when the interests of his clients would have been served, and subsequently were served, by a dismissal thereof. It also appears that his treatment of the clients—the placing of their property in the hands of other parties—was unfair. Nor can we resist the conclusion, especially when the facts of both these cases are considered, that he was associated with Zettler and Bliss in their search for persons harassed in mind by encumbered property.

██ Turning to the question of the disqualification of the chief justice and three associate justices, one of whom has since resigned, it should be noted that a motion to disqualify was made and denied from the bench in the first case herein considered.

Reverting to the grounds alleged for the disqualification, it is to be observed that if the justices mentioned are disqualified, the same objections, to a degree at least, might be interposed against all of the justices of this court and the justices of the District Court of Appeal. They are all members of the legal profession, even though, under the authority of *State Bar* v. *Superior Court, supra,* they are not active members of The State Bar, so as to be subject to the proceedings thereof. And, while perhaps all of them did not actively counsel or participate in approving the rules of professional conduct, it is difficult to believe that all of them were not vitally concerned and interested therein. Assuming such to be the fact, can it be said that such interest or participation could any more disqualify a justice than a similar interest or participation in an opinion declaring the conduct which should characterize a member of the profession? We think

not. The same reasoning disposes of the suggestion that they are disqualified because they aided in the formation of The State Bar, if such be the fact. There is no merit in the contention that the members of the court designated are in any manner disqualified. It might be well to add, however, that the discharge of the exclusive jurisdiction of this court cannot be prevented by the disqualification of all or a majority of its members. We read in 33 Corpus Juris, 989, as follows:

"The rule as to the disqualification of judges must yield to the demands of necessity. When disqualification, if permitted to prevail, destroys the only tribunal in which relief may be sought and thus effectually bars the doors of justice, the disqualified judge is bound to hear and decide the case."

To the same effect, see *Evans* v. *Gore*, 253 U. S. 245 [40 Sup. Ct. 550, 64 L. Ed. 887, 11 A. L. R. 519].

As heretofore mentioned, the Board of Governors recommended that petitioner be suspended for a total period of three years. We have no hesitancy in concluding that, under all of the circumstances of the cases herein, we should approve that recommendation.

It is ordered that petitioner be suspended from the practice of the law in this state for a period of three years, to commence thirty days after the filing of this order.

Shenk, J., Curtis, J., Langdon, J., Waste, C. J., Conrey, J., and Seawell, J., concurred.

Petition for rehearing and for modification of judgment denied.