[L.A. No. 30145. In Bank. Dec. 20, 1973.]

ALEXANDER H. SCHULLMAN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## Counsel

Alexander H. Schullman, in pro. per., for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## Opinion

THE COURT. — Alexander H. Schullman petitions for review after the State Bar Disciplinary Board found him guilty of professional misconduct[1] and recommended that he be suspended from the practice of law for two years.

This proceeding concerns three separate instances of misconduct. Petitioner is charged with failing to perform legal services after accepting a

---

[1]The local committee specifically found that petitioner violated his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, 6103), that he had abandoned his clients (Bus. & Prof. Code, §§ 6103, 6106; see Grove v. State Bar (1967) 66 Cal.2d 680, 683 [58 Cal.Rptr. 564, 427 P.2d 164]), and that he had committed acts of dishonesty and moral turpitude (Bus. & Prof. Code, § 6106). The disciplinary board reached the same conclusions.

$100 retainer to handle a case for the Regis H. Millers of Pittsburgh, Pennsylvania (hereinafter referred to as the Miller matter), with failing to take any legal action after being paid $500 by Maurice Stein to reopen a lawsuit that had been dismissed by the Los Angeles Superior Court (hereinafter referred to as the Stein matter), and, finally, with failing to file a malicious prosecution suit on behalf of Tulio M. Ortiz, who paid petitioner $250 to do so (hereinafter referred to as the Ortiz matter). In each instance, petitioner retained his fee despite failing to perform any services for his clients.

The local administrative committee[2] did not find misconduct in the Miller matter, but sustained the other charges against petitioner, and recommended a one-year suspension with four years of probation. The disciplinary board, however, found petitioner culpable on all three counts, recommending a two-year suspension.

Petitioner now raises two broad claims. He contends that the evidence does not support the board's findings and that he did not receive a fair and impartial hearing. This latter contention is based on several grounds. Petitioner claims bias because the State Bar uses its members, employees and officers to conduct disciplinary hearings instead of hiring independent, full time personnel for that job. He also asserts bias because the local administrative committee, prior to reaching a decision on petitioner's present culpability, considered his prior disciplinary record and set a date for the disciplinary phase of the hearing. All of these contentions lack merit.

1. *The evidence supports the findings of fact.*

■ This court is not bound by the findings and recommendations of the disciplinary board. We may independently review the record, weigh the sufficiency of the evidence and, in appropriate cases, impose disciplinary sanctions different from those urged by the State Bar. (*Glickman* v. *State Bar* (1973) 9 Cal.3d 179, 184 [107 Cal.Rptr. 65, 507 P.2d 953]; *Sturr* v. *State Bar* (1959) 52 Cal.2d 125, 127 [338 P.2d 897].)

■ Petitioner, however, bears the burden of showing that the board's action is erroneous or unlawful. (*In re Higbie* (1972) 6 Cal.3d 562, 569 [99 Cal.Rptr. 865, 493 P.2d 97]; *Alkow* v. *State Bar* (1971) 3 Cal.3d 924, 934 [92 Cal.Rptr. 278, 479 P.2d 638]; *Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 728-729 [87 Cal.Rptr. 368, 470 P.2d 352]; *Lee* v. *State Bar* (1970) 2 Cal.3d 927-929 [88 Cal.Rptr. 361, 472 P.2d 449].) Petitioner has failed to meet this burden. Our review of the record reveals substantial evidence in support of the board's findings.

---

[2]State Bar Local Administrative Committee No. 31 (Los Angeles) conducted the instant hearing.

a. *The Miller matter.*

On March 15, 1966, A. Morris Ginsburg, a Pennsylvania attorney, referred to petitioner a civil dispute involving two of Ginsburg's clients, Mr. and Mrs. Regis H. Miller. Ginsburg informed petitioner that the Millers had deposited $1,000 with a Los Angeles real estate brokerage towards the purchase of a home. The transaction never materialized, and the Millers believed they were entitled to a refund of their deposit. Ginsburg asked if petitioner could handle the case, and, if so, on what basis.

Two months later, on May 17, 1966, petitioner wrote to Ginsburg and offered to pursue the Millers' claim. He stated that if suit were necessary, he would contact Ginsburg and the Millers would be called upon to advance the costs. A week later, on May 25, 1966, Ginsburg forwarded all the documents relating to the case, and suggested a 35 percent contingent fee, with the Millers to advance costs. Ginsburg stated that if this proposal met with petitioner's approval he would obtain a "contingent fee letter" from the Millers.

On July 1, 1966, petitioner responded, stating: "I regret the delay in responding but the terms of your letter of May 25, 1966, are satisfactory. Please transmit to me contingent fee letter, which provides for our mutual sharing of the contingent fee; and, of course, the filing fee in the Superior Court is $20.50; there would be a service of process cost on the defendants.

"If your client can afford it, I would recommend that he advance $100 against costs and if successful, we would apply the overcharge against our fee, *and if unsuccessful, he would be entitled to the return of same.*" (Italics added.)

A month later, Ginsburg forwarded the requested $100 cost advance as well as a power of attorney from the Millers authorizing petitioner to proceed with their claim.

A few months later, on November 15, 1966, Ginsburg requested a status report. Petitioner replied on November 18, 1966, indicating that he had given the case to one of his associates. Petitioner said he hoped to expedite the matter and that he would advise Ginsburg shortly regarding any further progress. Petitioner did not identify the associate to whom he had given the case.

Ginsburg wrote to petitioner four times during 1967 and early 1968 requesting further status reports. Petitioner did not respond. Finally, on December 31, 1968, over two years after the referral, Ginsburg wrote a certified letter to petitioner requesting a refund of the retainer.

Attempting to justify retention of the fee, petitioner testified that one of his associates "handled the matter as well as he could." The record indicates, however, that petitioner never saw the file after giving it to an associate, that he did not know when he had given the case to an associate, and that he did not know which associate handled the claim. He presented no documentary evidence to indicate that he or anyone else in his office had ever done anything on the case.

b. *The Stein matter.*

For 18 years, Maurice Stein worked as an employee of Red Arrow Bonded Messenger Corporation. In July 1969, the company discharged him from employment. Later that year, Stein retained an attorney, Herbert M. Porter, who filed a complaint on Stein's behalf against the corporation, charging breach of an oral employment contract and religious discrimination.

The employer demurred to the complaint. The Los Angeles Superior Court sustained the demurrer with leave to amend, but Porter failed to amend within the prescribed time period. Consequently, on April 15, 1970, the superior court granted a defense motion to dismiss and on May 4, 1970, the order of dismissal was filed.

On Friday, May 1, 1970, three days before the filing of the order, Stein and a Mrs. Caroline Hurley visited petitioner's office. Stein retained petitioner, who agreed to attempt to set aside the dismissal of the civil action and to proceed further on the matter. Apparently, Stein also retained petitioner to represent him in a related matter before the California Unemployment Insurance Appeals Board.

Stein testified that during the initial office visit, petitioner "quickly examined the file" and began to discuss legal fees. Petitioner first mentioned a figure of $250 plus 25 percent of the recovery. Petitioner noted the urgency of the matter, explained that he would be compelled to call in extra office help to work over the weekend of May 2 and 3, 1970, and told Stein that the fee would have to be $500. Stein then gave petitioner a check for $200. Petitioner assured Stein that appropriate legal papers would be completed and in Stein's mailbox by the following Monday.

That same day, petitioner dictated a memorandum of facts relating to Stein's case. The memo states that petitioner planned to file a substitution of attorneys in the civil matter and that he would procure from Porter a "comprehensive affidavit" as to the reasons for Porter's failure to prosecute. The memorandum also recited the $500 fee to be charged Stein, that peti-

tioner would prosecute the action, and that the total fee would be 25 percent of the recovery less previous payments.

Stein and Mrs. Hurley each testified that on the following day, Saturday, May 2, 1970, they called petitioner's office in the morning and received no answer. That afternoon, they stopped by the office to see how petitioner was progressing on the case. They found no one at the office; the doors were locked.

On Monday, May 4, 1970, they again came to the office, and Stein paid petitioner the balance of the $500 fee. Stein and Mrs. Hurley stated that between their May 4, 1970, visit and mid-July 1970, they made a total of 30 to 40 telephone calls to petitioner and about 15 visits to his office. When they called to confirm an appointment with petitioner, they were often told by his staff that he was either ill, out of town, or in court. On the few occasions that he was able to get through to petitioner, Stein expressed concern over the statute of limitations. Petitioner repeatedly said that there was no hurry, that the case could be reopened at any time. Petitioner assured Stein that there was "no problem there."

Although petitioner claims that he prepared documents in the case, he does not identify any specific pleading or memorandum. Stein never saw any such documents other than the original memorandum of facts that was prepared on May 1, 1970, and the forms substituting attorneys. It is undisputed that petitioner never filed any documents in the civil suit other than the substitution forms.

It is also undisputed that in late June or early July 1970, Stein and Mrs. Hurley went to the Holiday Inn in Beverly Hills where petitioner was staying and, upon encountering him in the hall, asked for a refund of the $500 advance. Petitioner told them he would return their money and as a symbol of his good faith, gave Stein one dollar.

In October 1970, Stein substituted petitioner out as counsel and retained Joseph M. Wapner. Wapner promptly but unsuccessfully attempted to set aside the dismissal in the civil action.

On October 22, 1970, petitioner wrote Stein, stating: "I regret I have not paid to you the $500.00, as I promised, but without detailing the reasons therefor, things happen. Nonetheless, to insure that I am sincere in my promise, I am enclosing a Promissory Note made payable to you in ten days bearing 6% interest. . . .

"I am doing the above, not because I believe there is a meritorious claim, but more importantly, because I feel deeply in the matter, and the various

plights that are involved." At the time of the hearing before the local committee, petitioner had made no payments on the note.

In his direct testimony, petitioner attempted to justify the fee by showing the legal services that he had performed. His testimony is vague. Petitioner gives no details of his work other than mentioning the following contentions: that he discussed the matter with his associates as well as with Mr. Stein and Mrs. Hurley; that he prepared the May 1, 1970, memorandum; that he wrote a letter to former counsel Porter, and that he prepared the substitution forms so he could act as Stein's attorney in the case. Although he claims that he prepared a legal brief on the matter, he is unable to produce any proof of such document. He also fails to produce any evidence of his legal research.

### c. *The Ortiz matter.*

The third and final instance of petitioner's misconduct concerns one Tulio M. Ortiz. In mid-1970, Ortiz was arrested and jailed after an argument with his former brother-in-law, Ricardo Echevarria, who pressed charges of assault and battery against him. Ortiz retained an attorney to represent him in the criminal proceeding and gave the attorney evidence indicating the charges were false. The attorney succeeded in having the case dismissed.

Interested in recouping the money he had spent defending against the criminal charges,[3] and with restoring his reputation, Ortiz called on petitioner, gave him the facts of the case, and asked him to proceed against Echevarria.

Ortiz testified that petitioner agreed to file an action for malicious prosecution. Ortiz told petitioner at their first meeting that a "few days" had passed since his criminal case had been dismissed and that he did not know how long thereafter remained to file suit. Petitioner replied that the statute of limitations was "already running out," and that Ortiz should "take up the matter immediately." Petitioner asked for a $250 advance, promising that he would "file at least within one week's time."

Ortiz was compelled to borrow the money. He returned to petitioner's office on September 27, 1970, and paid him in cash; petitioner thereupon gave him a receipt marked "Retainer and Costs." At this second meeting petitioner reiterated that the case would be filed shortly. Petitioner proposed a 33 percent contingency fee arrangement, and said he would deduct from the fee the money already paid. Ortiz agreed to the proposal.

---

[3]Ortiz had spent $60 for bail and $350 for attorney's fees during the criminal action.

Ortiz had difficulty contacting petitioner after the September 27th visit. He called petitioner six or seven times and once, in December 1970, managed to reach him. Ortiz testified as follows concerning this telephone conversation: "Well, I asked him about what was happening in the case, I haven't received any information with regard to it, and he said that he had been ill and that he had instructed or he was instructing his secretaries to proceed to type the papers and to send them in, and so I was satisfied and I told him that later on I will contact him again."

That same month, Ortiz visited petitioner's office. Petitioner told him a secretary in the office had lost the papers and that he would "instruct the secretary to again type the papers so that the matter could be filed." Ortiz did not see any papers in connection with his case except for the handwritten notes which petitioner made at the first interview. Petitioner admits he never prepared any pleadings in the case.

Ortiz next contacted petitioner on February 13, 1971. He told petitioner that Echevarria had left Los Angeles to reside in El Salvador.

Two days later, on February 15, 1971, Ortiz wrote petitioner, expressing doubts as to petitioner's stated intention to prosecute the malicious prosecution action. The letter states in part: "For months I have had difficulty in talking to you as your answering service will never allow my calls to go through. In my several unannounced visits to your office I have been unable to find you and have received the following array of excuses: I have been out of town. I have been ill. I have been tied up in court. I think my secretary has already mailed the papers out. They tell me the man has already been served. Papers got lost, I'll have my secretary reissue the papers.

"On Saturday, February 13th . . . I indicated to you that I had been informed that the man I was suing had left the country to reside in El Salvador. To this you answered me that it was better this way. That now you would serve him and he would not be able to show up at court. You asked me then to come in to the office on Monday, . . . I arrived at your office and was told that you were not in that day. . . .

"I have now felt suspicion about your intent to fulfill your part of the contract. . . ." Ortiz asked petitioner to return the $250 advance.

Ortiz never heard from petitioner. He sent another letter, dated March 26, 1971, via certified mail, return receipt requested. Ortiz expressed his hope in this letter that the matter could be settled amicably, but noted that if he did not receive satisfaction within five days, he would complain to the State Bar. Petitioner never returned any of Ortiz' money.

Petitioner presented no documentary evidence to rebut Ortiz' accusations, relying instead upon his own testimony. Petitioner claims he urged Ortiz not to sue because the entire dispute was a "family matter." Ortiz repeatedly denied that petitioner recommended against suit.

When asked by the State Bar examiner to explain the meaning of the word "costs" in the receipt for Ortiz' $250 advance, petitioner testified that he told Ortiz that if suit were brought there would be certain costs and in the event he did not sue, the advance would be included in the retainer. Petitioner also told Ortiz that if a slander suit were instituted, a $500 bond would have to be deposited.

Petitioner claims he brought "peace" to the Ortiz-Echevarria family. According to petitioner, he entered the fray, spoke to Echevarria and "solved the situation." He gives no details as to how he resolved the matter. Although he testified he prepared a complete memorandum of facts and law "on the statutes on the slander or libel $500 bond," petitioner never presented the committee with any document relating to the Ortiz matter. He said he had looked for his papers on the case, but could not find them.

██ The evidence clearly establishes a common course of conduct. Petitioner accepts a fee, promises to perform legal services, and then fails to follow through for his clients. In each instance outlined above, the record indicates he retained his fee despite avoiding his clients and ultimately abandoning their interests. The record shows professional misconduct on petitioner's part and amply supports the findings of the disciplinary board.

## 2. *Petitioner received a fair and impartial hearing.*

Petitioner's contention that he did not receive a fair and impartial hearing is three-fold. He first attacks the use of members, employees and officers of the State Bar in the conduct of disciplinary proceedings involving attorneys, claiming that the bar must use independent personnel for this task. Petitioner secondly argues that the local committee improperly considered the prior disciplinary record. Finally, petitioner contends that the local committee further prejudiced his case by setting a date for the phase of the hearing pertaining to the recommendation of discipline before determining his culpability. Thus, he claims, the committee "prejudged" his case.

Petitioner, however, points to no specific evidence of bias. He also fails to cite any relevant authority, nor can we find any, that supports his position.

a. ■ *The State Bar is not required to use independent personnel to conduct disciplinary hearings.*

Petitioner's contention that members, employees and officers of the State Bar are incapable of sitting fairly in this or any other disciplinary hearing is totally without merit. We have long respected the ability of the State Bar to regulate itself. In *Brotsky* v. *State Bar* (1962) 57 Cal.2d 287, 301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310], we said: "[I]t is clear that the Legislature quite properly considered the fact that a 'self governing bar' should have the opportunity of policing its own ranks, and bringing disciplinary matters to the attention of the courts in those cases where the courts did not have knowledge of the infractions, or where no other third party would be likely to make direct complaint to the court." (See also, *Chronicle Pub. Co.* v. *Superior Court* (1960) 54 Cal.2d 548, 565-568 [7 Cal.Rptr. 109, 354 P.2d 637].)

Furthermore, petitioner presents no argument outlining the details of his contention. We faced a similar issue in *Johnson* v. *State Bar* (1935) 4 Cal.2d 744, 758 [52 P.2d 928]. In *Johnson,* an attorney challenged the validity of the State Bar Act (Bus. & Prof. Code, § 6000 et seq.), which authorizes, among other things, the instant proceeding. We upheld the statute, stating: "With respect to the constitutionality of the act, petitioner says it is unconstitutional, without the citation of authority or an argument other than an attack upon the methods of the State Bar. It is a rule, well settled, that such a presentation of the subject is insufficient to require us to pass upon the points suggested. However, it is to be noted that the constitutionality of the act was thoroughly considered and discussed and decided contrary to petitioner's contention in the case of *State Bar* v. *Superior Court* [1929] 207 Cal. 323 [278 Pac. 432]."

A brief review of the Rules of Procedure of the State Bar[4] indicates that

---

[4]Hereinafter we refer to these rules as Rules of Procedure. State Bar disciplinary proceedings are governed *exclusively* by these rules. (*Fish* v. *State Bar* (1931) 214 Cal. 215, 222 [4 P.2d 937]; *Marsh* v. *State Bar* (1934) 2 Cal.2d 75, 78 [39 P.2d 403]; *Herron* v. *State Bar* (1944) 24 Cal.2d 53, 66 [147 P.2d 543].) These proceedings are not criminal in nature (see *Eschwig* v. *State Bar* (1969) 1 Cal.3d 8, 18 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662]; *Best* v. *State Bar* (1962) 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325]), but rather are designed to protect the public from persons unfit to practice law (*In re Higbie* (1972) 6 Cal.3d 562, 570 [99 Cal.Rptr. 865, 493 P.2d 97]; *Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 151 [77 Cal.Rptr. 657, 454 P.2d 329]; *Resner* v. *State Bar* (1960) 53 Cal.2d 605, 613 [2 Cal. Rptr. 461, 349 P.2d 67]). Although the rules of criminal procedure do not apply, some criminal defenses are available in disciplinary proceedings (see, for example, *Patty* v. *Board of Medical Examiners* (1973) 9 Cal.3d 356 [107 Cal.Rptr. 473, 508 P.2d 1121] (allowing defense of entrapment).)

petitioner has a wide array of procedural safeguards to protect him against possible prejudice. Indeed, the Rules of Procedure provide attorneys charged with misconduct a "panoply of legal protection," (cf. *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 145 (fn. 12) [93 Cal.Rptr. 234, 481 P.2d 242]); see also *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 75 [64 Cal.Rptr. 785, 435 P.2d 553]), and insure that administrative due process will be observed. (See *Brotsky* v. *State Bar, supra,* 57 Cal.2d at p. 301.) The rules provide for adequate notice of charges, and allow attorneys an opportunity to be heard, to present a defense, to engage in discovery, to present evidence, to subpoena books and records, as well as to confront and cross-examine witnesses. (Bus. & Prof. Code, § 6085; see generally, Rules of Procedure, rules 8-42; 6 Cal.Jur.2d Rev., Attorneys at Law, § 200 et seq.)

If petitioner desired to challenge any member of the local committee, he had only to invoke rule 15. Under that rule he has the right to remove any member of the committee who would be disqualified as a judge under the first four divisions of Code of Civil Procedure section 170.[5] Petitioner, however, did not avail himself of this provision. Instead he charges that members of the State Bar—because of their membership—are incapable of impartiality in his case. Mere membership in the bar, however, is no sign of bias, nor does it indicate, without additional proof, that a person is incapable of fairly evaluating evidence. (Cf. *Johnson* v. *State Bar, supra,* at pp. 759-760.) If anything, the opposite is true.

Petitioner also challenges the hearing examiner on the ground that he is employed as a staff attorney by the State Bar. This claim can be dismissed in light of Rules of Procedure, rules 3.6, which allows State Bar staff attorneys to serve as hearing examiners.[6] The examiner in this case was properly appointed under this rule, and petitioner fails to demonstrate any impropriety that would cause us to question the examiner's honesty and integrity.

---

[5]The first four subdivisions provide generally for the disqualification of a judge who is an interested party in litigation before him. Subdivision 5 of section 170, which is not included under rule 15, provides for disqualification for bias or prejudice.

We note that petitioner can remove a member of the committee pursuant to rule 15 *only* if a member would be disqualified as a judge under the *first four* subdivisions of section 170. Therefore, petitioner cannot remove a member on a general claim of bias. (See *Fish* v. *State Bar, supra,* 214 Cal. at p. 225.) In *Fish* we noted: "The rule is well settled that there is no disqualification upon the ground of bias or prejudice in administrative proceedings, particularly when the administrative board is the only body that can practically pass upon the particular case. (*Federal Const. Co.* v. *Curd* [1918] 179 Cal. 489 [2 A.L.R. 1202, 177 Pac. 469].)" (See also, *Johnson* v. *State Bar, supra,* 4 Cal.2d at p. 760; 2 Davis, Administrative Law Treatise (1958) § 12.04.)

[6]See also, Rules of Procedure, rules 16, 24(a), and 47.

Petitioner thus does not make any showing that the composition of the committee or the selection of the hearing examiner prevented him from receiving a fair and impartial hearing.

b. *Both the local committee and the disciplinary board properly considered petitioner's prior record.*

In 1963, we found petitioner guilty of professional misconduct and placed him on probation for three years. (*Schullman* v. *State Bar* (1963) 59 Cal.2d 590, 601 [30 Cal.Rptr. 834, 381 P.2d 658].) That proceeding involved a loan to petitioner from his clients, the Kaufmans. Petitioner induced them to accept false security for the loan, later arranged for an illegal income tax deduction for Mr. Kaufman as partial repayment, and finally misappropriated $8,000 worth of funds earmarked for the Kaufmans pursuant to the loan obligation.

In 1971, we suspended petitioner from practice for six months. (Schullman v. State Bar, L.A. 29854 [minute order].) Petitioner had abandoned the interest of his client, a Mr. Hammer, in a civil appeal. After having received the funds from his client to pay for clerk's and reporter's transcripts on appeal, petitioner failed to file such transcripts on time. Petitioner converted the money to his own use and misled the appellate court by falsely representing that his client was unable to raise the transcript costs.

While this prior conduct cannot establish culpability in the Miller, Stein and Ortiz matters, the local committee and the disciplinary board may consider petitioner's past disciplinary record in deciding the appropriate sanctions to be imposed in the instant case. (*Simmons* v. *State Bar, supra,* 2 Cal.3d 719, 731; *Eschwig* v. *State Bar, supra,* 1 Cal.3d 8, 18; *Herron* v. *State Bar, supra,* 24 Cal.2d 53, 66; see Rules of Procedure, rule 29.1.)

At the time of petitioner's hearing, rule 29.1 provided in part: "The record in any prior disciplinary proceeding against the same respondent, or any pertinent part thereof, is admissible in evidence either (a) if, under the rules of relevancy, it tends to prove any fact at issue in the pending proceeding, other than degree of discipline; or (b) for the purpose of giving aid in determining the degree of discipline to be administered, in the event culpability be found when

"(1) such prior proceeding has resulted in the administration of discipline and has become final; or

"(2) such record contains findings of fact and recommendation for discipline made by a disciplinary board in a formal proceeding of which the respondent had notice, or at which he appeared."

We have never held that this rule requires a bifurcated hearing—one which entails separate proceedings for the determination of culpability and discipline. We noted in *Resner* v. *State Bar* (1960) 53 Cal.2d 605, 613 [2 Cal.Rptr. 461, 349 P.2d 67]: "As the ultimate purpose of a disciplinary proceeding is to determine the fitness of the attorney to practice law, rather than to punish for individual breaches of conduct (*In re Rothrock* [1940] 16 Cal.2d 449, 454 [106 P.2d 907, 131 A.L.R. 226]), it would appear that a committee, or the Board of Governors, or this court might consider all matters properly before it, even though extrinsic to the instant record, in determining an attorney's fitness to practice. No denial of any inherent right of an attorney is suggested by such a procedure. [Citations.]"

In the instant case, however, the committee chose to postpone consideration of petitioner's prior record until after it had decided the question of present culpability. The examiner did refer vaguely to petitioner's prior record during the hearing in chief, but neither details nor elaboration of past offenses clouded the issues before the committee in the Miller, Stein and Ortiz matters. The examiner merely asked the committee when he could introduce "records of the State Bar relating to a *particular respondent.*" Although the reference to petitioner is obvious, the committee carefully took steps to prevent prejudice stemming from petitioner's past misconduct.

Even though the committee is not required by rule 29.1 to bifurcate the hearing, the committee did, in essence, employ such a procedure. The committee stated that it would only admit prior records on the question of discipline, rather than on the question of culpability. ▪ The examiner formally introduced petitioner's records on September 16, 1972, during the phase of the hearing devoted to the recommendation of discipline. The committee did not consider petitioner's prior misconduct until after reaching a decision in the instant case.

Clearly, the committee's action did not prejudice the case, nor did the examiner's initial reference to the 1963 and 1971 records. Substantial evidence had already established the case against petitioner, and therefore it is doubtful that the brief reference to petitioner's prior record by the examiner had any cognizable effect upon the committee. (Cf. *Walling* v. *Kimball* (1941) 17 Cal.2d 364, 369-370 [110 P.2d 58]; *Kalfus* v. *Fraze* (1955) 136 Cal.App.2d 415, 423 [288 P.2d 967]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 303, 305.)

The committee's approach is consistent with our recent holding in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], in which we considered a related question—the admissibility of prior felony

convictions for the purpose of impeaching a witness in a criminal trial.[7] The problem in *Beagle,* and in similar cases, is that prior convictions, while relevant to a witness's honesty or veracity (Evid. Code, § 788), at the same time may be unduly prejudicial (Evid. Code, § 352). In *Beagle,* we did not attempt to establish rigid standards for the admissibility of such evidence, but instead held that "each instance must depend upon the sound exercise of judicial discretion." (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453.)

In the instant case, the local committee wisely postponed consideration of petitioner's prior record until after deciding culpability on the present charges. While such procedure may not have been required under rule 29.1, it assured petitioner of a fair hearing.

    c.   *Setting the date for the disciplinary phase of the hearing before determining culpability did not prejudice petitioner.*

■ Petitioner also claims the local committee "prejudged" his case by setting a date for consideration of discipline without having first determined culpability. Petitioner's characterization of the facts is not entirely accurate. The chairman of the committee did not set a "sentencing date" per se, but rather, continued the hearing, leaving open the possibility for further proceedings in the event the committee found petitioner culpable. Thus, the continuance was conditional in nature. Petitioner had every opportunity to present evidence, to call witnesses and to argue his version of the facts; the record indicates that the committee fully evaluated the evidence pertaining to the Miller, Stein and Ortiz matters and did not weigh disciplinary sanctions before deciding whether any violations occurred. That the committee continued the case as it did in no way demonstrates an exercise of premature judgment.

3.  *The disciplinary recommendation is proper.*

■ Although the ultimate resolution of discipline rests with this court, we attach great weight to the recommendation of the board. (*Vaughn* v. *State Bar* (1973) 9 Cal.3d 698, 701 [108 Cal.Rptr. 806, 511 P.2d 1158]; *Black* v. *State Bar* (1972) 7 Cal.3d 676, 683-684 [103 Cal.Rptr. 288, 499 P.2d 968]; *Sturr* v. *State Bar, supra,* 52 Cal.2d 125, 127.) In this case our review of the record supports the board's recommendation.

---

[7]*Beagle* is distinguishable from the instant case. In *Beagle,* the problem concerned the admissibility of a prior conviction; here, in contrast, there is no question about the *admissibility* of petitioner's prior record. The question is only whether he was unduly prejudiced by the examiner's brief *reference* during the hearing-in-chief to past disciplinary proceedings.

It is ordered that petitioner be suspended from the practice of law for a period of two years. It is further ordered that within 30 days after the effective date of this order petitioner shall perform the acts specified in rule 955, subdivision (a), California Rules of Court, and that within 40 days after the effective date of this order petitioner shall file with the clerk of this court, with proof of service of a copy on the State Bar at its San Francisco office, an affidavit containing the matters specified in subdivision (c) of the foregoing rule. This order is effective 30 days after the filing of this opinion.