[L. A. No. 19177.   In Bank.   June 22, 1945.]

ISIDORE LINDENBAUM, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Isaac Pacht and Harry J. Miller for Petitioner.

Paul Nourse and Clarence B. Runkle for Respondent.

THE COURT.—This is a proceeding to review the recommendation of the Board of Governors of The State Bar that petitioner be suspended for the period of six months.

Petitioner was charged with the violation of his oath and duties as an attorney and the commission of acts involving moral turpitude within the meaning of sections 6103 and 6106 of the Business and Professions Code. He made answer to the charges and at the hearings before the local administrative committee, both the complainants and the petitioner testified. From the evidence, both oral and documentary, introduced at its hearings, the local committee found that petitioner had violated his oath and duties as an attorney, but that he had not committed acts involving moral turpitude. Accordingly, it recommended that petitioner be disciplined by public reprimand. Following an examination of the record and the hearing of supplemental testimony from petitioner, the Board of Governors adopted the local committee's findings, made certain additions thereto, and expressly concluded upon the amplified findings that petitioner had been guilty of conduct involving moral turpitude as well as a violation of his oath and duties as an attorney. Accordingly, the Board of Governors recommended an increase in the measure of discipline to a six months' suspension from the practice of law. Petitioner seeks to have this recommendation disapproved on the ground that it is excessive and not supported by the evidence.

It appears that for some time prior to January 6, 1941, petitioner had acted in several matters as attorney for Ross Lansing, one of the complaining witnesses. On that date Frances Lansing filed against said Ross Lansing a complaint for separate maintenance, on the grounds of adultery and extreme cruelty. In said complaint, Alice Shelton was named as corespondent. Petitioner represented Ross Lansing in the defense of this action, and on his behalf filed a demurrer to the complaint on January 15, 1941. Petitioner referred Alice Shelton to another attorney, who, after consultation with peti-

tioner, filed for her on January 16, 1941, a verified answer which denied specifically the acts of adultery charged in the complaint. On January 27, 1941, a first amended complaint for separate maintenance, setting forth more explicitly the previous charges of adultery, was filed. It was thereupon stipulated between counsel for plaintiff and counsel for the corespondent that the latter's answer to the original complaint as theretofore filed might be deemed an answer to the first amended complaint. On February 7, 1941, petitioner filed his client's verified answer to the first amended complaint, which answer made specific denial of all the adultery charges. On April 3, 1941, following a property settlement agreement, plaintiff filed a second amended complaint, wherein she alleged only extreme cruelty, eliminated all reference to the previous adultery charges and to Alice Shelton as corespondent in connection therewith, and prayed for a divorce. Petitioner then filed his client's verified answer denying the allegations of extreme cruelty as contained in said second amended complaint. On April 11, 1941, the action was called for trial upon the issue of extreme cruelty. Petitioner did not appear at the trial until after the completion of all the testimony by plaintiff and her corroborating witness. Neither Ross Lansing nor Alice Shelton was present at the trial; there was no cross-examination and there was no testimony offered on their behalf. Findings of fact and conclusions of law were waived by counsel and an interlocutory decree of divorce was granted, to plaintiff. That decree became final on April 15, 1942.

Thereafter Ross Lansing and Alice Shelton, the other complaining witness here, were married. In October, 1943, Ross Lansing filed a voluntary petition in bankruptcy, and petitioner's claim for legal services was listed therein. Lansing was represented by another attorney in the bankruptcy proceeding. Petitioner received notice of the first meeting of creditors to be held on November 3, 1943, and attended it. He left the hearing during the course of Lansing's testimony, and as he was walking along the hall on the way to make a telephone call, he met the bankrupt's wife, Alice Shelton Lansing. In the course of conversation he told her that he was still Lansing's attorney of record in a number of pending actions, that her husband should have certain information about those matters, and that he would discuss them with her

if she would call at his office. A few days later she did visit petitioner in his office; and, while he did advise her with respect to certain matters in which he was representing Lansing, he further stated on that occasion that he didn't think that her husband was treating him fairly in including his claim along with those of "merchandise creditors" in the bankruptcy schedule. Further testimony relating to their conversation will be hereinafter discussed.

A few days after said visit and on November 12, 1943, petitioner addressed a letter to the Bureau of Immigration and Naturalization in the Federal Building at Los Angeles, reading as follows:

"In the event an application is made for the naturalization of Alice Lansing, formerly Alice Shelton, may I refer to the case of Lansing v. Lansing, L. A. Superior Court Case No. D201,044, as a matter in which the former wife of Ross Lansing sued him for divorce and named said Alice Shelton as a corespondent. The complaint indicates certain matters which may involve moral turpitude.

"If I can be of any further service to you within the limitations of professional proprieties, you may feel free to call upon me."

At the time this letter was written Alice Shelton Lansing had already been admitted to citizenship, but petitioner did not know that fact. He apparently believed she was planning to make application. Within a few days petitioner, in response to his letter, received a telephone call from an official of the Bureau of Immigration and Naturalization asking for further details as to the adultery charges in the Lansing divorce proceedings before reopening the citizenship matter in question. Thereafter, and on November 29, 1943, petitioner again wrote to the bureau, advising that the former wife of Ross Lansing had commenced her action against him on January 6, 1941 (the date of the filing of the original complaint for separate maintenance), naming Alice Shelton as corespondent. In said letter petitioner then quoted in full that portion of the superseded first amended complaint containing the allegations of adultery, and further stated that, as he recollected, "testimony . . . along these lines was given by witnesses at the time of the hearing of divorce, which went without opposition on the part of either Ross Lansing or

Alice Shelton." Petitioner sent a copy of this letter of November 29th to Ross Lansing.

Petitioner's conduct in his dealings with Alice Shelton Lansing and his subsequent communications with the Bureau of Immigration and Naturalization led to the present disciplinary proceeding against him.

At the hearing before the local administrative committee Alice Shelton Lansing recounted at some length the conversation had with the petitioner in his office a few days following the first meeting of creditors on her husband's bankruptcy petition. Thus, she testified that on the occasion of her visit petitioner "pointed out that he was very much disappointed because Mr. Lansing had included him in the bankruptcy and he didn't think it was a fair thing to do after all the work he had done for him"; that she expressed her regret that her husband found it necessary to follow such procedure, but added they "had both been working very hard for a government project in Utah and had not been able to clear up all of Mr. Lansing's financial obligations and he had to go through bankruptcy"; that petitioner thereupon remarked, " 'The fact that you get along with Mr. Lansing now, sometimes the picture changes but *an attorney can always leave himself a few aces in the hole and I intend to use those when the time comes' ";* and that she then said, " 'Well, what is it, I would like to know how I stand,' " but he merely responded, " *'I am sorry I can't tell you because it would sound like a threat.' "* She further testified with reference to this same occasion that petitioner said *"there were things which he intended to use against both of us, Mr. Lansing and me, and which would hurt both of us, not only personally but in business too,* and I asked him again what it was and he said he couldn't tell me." Petitioner directly contradicted the above italicized portion of Alice Shelton Lansing's account of their conversation, but his denial merely created a conflict in the evidence which the fact-finding body had to resolve. (*Aydelotte* v. *State Bar,* 209 Cal. 737, 739 [290 P. 41].) ▮ And while the findings of the fact-finding body are not binding on this court, they "should be accorded persuasive force" and "should be entitled to great weight" in this proceeding. (*Light* v. *State Bar,* 14 Cal.2d 328, 336-337 [94 P.2d 35].)

▮ Petitioner's claim that his sole purpose in having

Alice Shelton Lansing come to his office was to advise her with respect to the status of pending matters in which her husband was interested is not convincing under the circumstances. While he did so inform her as to such unfinished matters, and particularly as to the effect of the bankruptcy on the discharge of these claims, it would seem more reasonable to conclude that if petitioner felt he "had [a] certain responsibility there," he would have communicated directly with his client, rather than the client's wife, or that he would have called his client's bankruptcy attorney, whom he knew. Petitioner argues that he had no ulterior motive in establishing his contact with Alice Shelton Lansing because though he felt that he had been "badly treated," he told her that since her husband had seen fit to list him as a creditor on the bankruptcy schedule, "that would have to be the way it was and [he] was writing it off"; and that in response to her statement, " 'I am sorry, I would like to do something for you but I am just working on a salary,' " he said, " 'There is no reason why you should pay anybody else's bill.' " But these statements by petitioner are not of themselves inconsistent with Alice Shelton Lansing's version of their conversation as embracing veiled threats of action against her and her husband if his claim for legal services was not paid. In fact, if neither she nor her husband paid his bill or acknowledged the indebtedness, he would have no alternative but to "write it off," for that would be the effect of Lansing's discharge in bankruptcy; and his remark that he did not consider it her financial obligation is readily susceptible of interpretation as a protective comment in the event that their conversation should be related to others.

Petitioner's conduct following his conversation with Alice Shelton Lansing places him in a still more unfavorable light, and this admitted conduct bears out her version of their conversation rather than his. Thus, within a week thereafter he undertook the above-recited correspondence with the Bureau of Immigration and Naturalization, indicating his knowledge of "certain matters which may involve moral turpitude." In his talk with Alice Shelton Lansing he had learned that she and her husband were working together on a government project. He did not then know her citizenship status, but it is reasonable to assume that he recognized the serious import of an investigation concerning the character of an alien while

so employed. When he so wrote to the bureau, he knew that his quoted charges of adultery, as made in the superseded first amended complaint, had been denied under oath by both his client Ross Lansing and the named corespondent, Alice Shelton. He also knew that the Lansing divorce action was tried on the single issue of extreme cruelty, that the corespondent was not at the time of trial a party to the action, and that there was therefore no occasion for her to appear in court in answer to the eliminated adultery charges. Yet he implied in his correspondence with the bureau that the adultery charges were tacitly admitted because the divorce "went without opposition on the part of Ross Lansing or Alice Shelton." He further stated in writing to the bureau that it was his recollection that testimony along the lines of the allegations of adultery was given at the hearing in the Lansing divorce matter, although he knew that he was not present when the witnesses testified and now admits that he only had a brief summary of the testimony given him by plaintiff's counsel in that case. Moreover, the record of the evidence produced in that divorce hearing discloses that the only reference therein made to Alice Shelton was the statement that she had been seen in public with Ross Lansing. There was no testimony that would establish that they had committed adultery. Yet petitioner made such insinuations as would incite an investigation of charges that he had no reason to believe were true.

Petitioner maintains that his correspondence with the bureau is not censurable because it only related to matters of public record in its reference to the pleadings in the Lansing divorce action and in its recommendation of an examination of the reporter's notes to verify the evidence at the trial. But such observation does not deflect from the reprehensible nature of petitioner's conduct for the correspondence, by reason of its implications and deliberate omission of salient facts, was obviously designed to provoke, without justification, an inquiry which would result perhaps in injury, and certainly in embarrassment, to petitioner's client and his client's wife. The conclusion seems inescapable that the correspondence was engendered by the petitioner's admitted ill feeling toward Lansing because of the bankruptcy matter. Petitioner argues that he was only prompted by a patriotic duty to impart to the immigration authorities information which might affect

the propriety of granting citizenship to an alien. If such was his motive in undertaking the correspondence with the bureau, it seems strange that he should have waited some two and one-half years before having this estimable urge, and that the correspondence should have followed so closely his conversation with Alice Shelton Lansing concerning the listing of his claim in her husband's bankruptcy petition. But even if it could be said that petitioner was merely performing a civic duty in making such report to the bureau, he nevertheless would have had the correlative obligation of fairly and honestly stating all the facts to the end that the letters would not have provoked an investigation that might not have been undertaken if the facts had been fully and truly stated. Furthermore, when cross-examined as to his purpose in writing the first letter to the bureau, petitioner testified as follows: ". . . In other words, I suppose I felt that I had been grossly misused, and in that connection I presume I wrote that letter. Q. In other words, you wrote the letter to get even? A. It is hard for me to answer that. Possibly, as I look back at it now that might have had something to do with my writing that letter."

As evidence that his two letters to the bureau were sent openly and in good faith, petitioner refers to the fact that a copy of the second, detailing the abandoned adultery charge and suggesting further inquiry by the bureau, was forwarded to Lansing to keep him informed. But this circumstance seems rather to suggest that petitioner, after failing to provoke some arrangement for payment of his bill following his private conference with Alice Shelton Lansing, was keeping Lansing "informed" as to the consequences. Petitioner testified that he sent this copy to Lansing because "I wanted to make a disclosure of everything that I might be doing that affected him in any way at all." But reference to other portions of the record does not sustain petitioner's explanation. Thus, petitioner stated that following the Lansing bankruptcy hearing, he closed several files of pending cases involving Lansing and he advised the attorneys on two of the claims listed in the bankruptcy schedule that he "would no longer be responsible for Lansing," although he admittedly remained "the attorney of record" in those matters. Purportedly feeling an obligation to disclose to Lansing everything "that affected him in any way at all," petitioner nevertheless failed to give Lansing any notice of his abandonment of those cases.

Review of the record herein shows that the preponderance of substantial evidence supports the findings of the Board of Governors to the effect that petitioner, in his private conference with Alice Shelton Lansing, made threats of action injurious to her and to his client, Ross Lansing, in an attempt to force through fear the payment of his bill for legal services, and that failing in this endeavor, his motive was punitive in writing, without justification, to the immigration authorities in an effort to incite an investigation of a supposed alien through a misrepresentation of facts. These findings justified the determination that petitioner had "violated his oath and duties as an attorney" and had "committed acts involving moral turpitude." While the term "moral turpitude" has been defined in various ways, petitioner's acts involved moral turpitude under any of the approved definitions of that term. (*Herron* v. *State Bar*, 24 Cal.2d 53, 59-60 [147 P.2d 543] ; *In re Craig*, 12 Cal.2d 93, 97 [82 P.2d 442] ; *Jacobs* v. *State Bar*, 219 Cal. 59, 64 [25 P.2d 401] ; *Lantz* v. *State Bar*, 212 Cal. 213, 218 [298 P. 497] ; *In re O'Connell*, 184 Cal. 584, 587 [194 P. 1010].) ■ It is only necessary to point out that among the above-enumerated acts of petitioner were acts constituting the crime of attempted extortion. (Pen. Code, §§ 518 and 664.) It is immaterial that the money which petitioner sought to obtain through threats may have been justly due him. (*People* v. *Beggs*, 178 Cal. 79 [172 P. 152].)

■ It therefore appears that petitioner has not met the burden of showing wherein the determination of the Board of Governors is erroneous or unlawful. (*Aydelotte* v. *State Bar*, 209 Cal. 737, 740 [290 P. 41] ; *Light* v. *State Bar*, 14 Cal. 2d 328, 336-337 [94 P.2d 35] ; *Gaffney* v. *State Bar*, 20 Cal. 2d 735, 739, 740 [128 P.2d 516].) ■ While "charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty, and any reasonable doubts should be resolved in favor of the accused" (*Hildebrand* v. *State Bar*, 18 Cal.2d 816, 834 [117 P.2d 860]), the record in this proceeding fully justifies the findings and the disciplinary recommendation here under review. (*Aydelotte* v. *State Bar, supra; Ring* v. *State Bar*, 218 Cal. 747, 750 [24 P.2d 821].) In fact, the disciplinary recommendation of suspension for a period as short as six months appears to be justified only by the evidence showing that petitioner had never been previously charged with professional

misconduct since his admission to practice in 1930, and by the character evidence showing that he had previously borne a good reputation.

It is therefore ordered that the petitioner be suspended from the practice of law for a period of six months commencing thirty days after the filing of this decision.

CARTER, J.—I concur in the conclusion reached, but upon the sole ground that there is sufficient evidence from which an inference can be drawn that petitioner's motive in talking with Alice Shelton Lansing after the creditors' meeting was to attempt, by a veiled threat at least, to induce her to pay him the amount her husband owed him. His conduct in this regard bordered on attempted extortion and was reprehensible, justifying the discipline administered.

I do not, however, agree that petitioner should be disciplined for writing the letters to the Bureau of Immigration, as I think that he had a legal and moral right to do what he did in this regard. If he had such right, his motive in exercising it is immaterial. (*J. F. Parkinson Co.* v. *Bldg. Trades Council,* 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A. N.S. 550] ; *Fisher* v. *Feige,* 137 Cal. 39 [69 P. 618, 92 Am.St. Rep. 77, 59 L.R.A. 333] ; *Union Labor Hosp. Assn.* v. *Vance R. Lumber Co.,* 158 Cal. 551 [112 P. 886, 33 L.R.A N. S. 1034] ; *Couley on Torts* (vol. 2), p. 1505; 1 Cal.Jur. 336; 1 Am.Jur. 420.) While I do not consider his conduct in writing the letters in question, under the circumstances disclosed by the record, as being at all commendable, I can see nothing in connection therewith which savors of moral turpitude or which would justify discipline. It is obvious that his only purpose in writing the letters was to cause an investigation to be made as to the moral character of Alice Shelton Lansing. In making this investigation the bureau would be required to examine the record and interview witnesses having knowledge of the facts. If the investigation disclosed that she was an unfit person to become a citizen of the United States, the disclosure would certainly have been in the public interest. On the other hand, if she was found to be of good moral character, she would suffer no ill effects therefrom. Certainly, if petitioner had done nothing more than write the letters in question, it could hardly be said that he violated any duty he owed to either Ross Lansing, his former client, or his wife, Alice Shelton Lansing.

In my opinion the conduct of the petitioner in the case at bar in indicating to Alice Shelton Lansing that unless he received the money due him from her husband he intended to use things against them which would be detrimental to them personally and in their business, comes within any accepted definition of moral turpitude and justifies the discipline recommended in this case.

EDMONDS, J.—I concur in the conclusion that the evidence amply supports the findings against the petitioner and fully justifies the imposition of discipline for unprofessional conduct. But I cannot reconcile with those findings the very slight penalty fixed by the Board of Governors and adopted by the court. My associates agree that Lindenbaum committed acts of moral turpitude constituting the crime of attempted extortion. Many attorneys have been disbarred for a breach of professional duty of much less gravity.