[L.A. No. 30241. In Bank. Dec. 19, 1974.]

WILLIAM J. BLUESTEIN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Morris Lavine and Joan Celia Lavine for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

THE COURT.—This is a proceeding to review a recommendation of the

Disciplinary Board of the State Bar that petitioner be suspended from the practice of law for six months.[1]

Petitioner, who was admitted to practice in 1957, was charged with, inter alia, (1) violating his oath and duties as an attorney (see Bus. & Prof. Code, §§ 6103, 6067 & 6068) and committing acts involving moral turpitude (see Bus. & Prof. Code, § 6106) by using extortionary means to attempt to obtain payment of his attorney's fee in a divorce action and (2) wilfully violating rule 3, Rules of Professional Conduct of the State Bar (see Bus. & Prof. Code, § 6077)[2] by aiding and abetting an unlicensed person to practice law in California. Further particulars concerning the misconduct were also alleged. Petitioner denied the charges.

### *Whether Petitioner was Guilty of Misconduct in Connection with the Dorff Matter*

In June 1970 Mrs. Robert Dorff retained petitioner to represent her in a divorce action. On July 29, 1970, Robert Dorff came to petitioner's office and a fist fight ensued between Mr. Dorff and petitioner, following which petitioner made a citizen's arrest and preferred criminal charges of assault and battery against Mr. Dorff. Petitioner estimated that as a result of the fight he incurred $200 property damage and $70 medical expenses.

A few days after the fight the Dorffs signed a marital settlement agreement, which called for the payment by Mr. Dorff of his wife's attorney's fee of $1,000 to petitioner following certain events.

Between the date of the fight and the commencement of the criminal trial against Mr. Dorff on September 28, 1970, the Dorffs reconciled. During this period petitioner had certain conversations with Mrs. Dorff

---

[1] The board's vote was 12 to 1. The dissenter thought the recommended discipline insufficient in view of petitioner's prior record, which is discussed hereinafter. The board further recommended that we require that petitioner comply with rule 955, California Rules of Court.

The local committee (2 members) unanimously recommended 90 days suspension.

[2] Section 6077 authorizes discipline for a "wilful breach" of the Rules of Professional Conduct.

Rule 3 provides: "A member of the State Bar shall not employ another to solicit . . . professional employment for him; nor, except with a person licensed to practice law, shall he . . . share compensation arising out of . . . professional employment; *nor shall he directly or indirectly aid or abet any person not so licensed,* or any association or corporation, *to practice law* or to receive compensation therefrom. . . ." (Italics added.) References hereinafter to "rule 3" are to the quoted rule.

and the attorneys for Mr. Dorff, Raymond Denenberg and Bruce Friedman. The evidence regarding those conversations may be summarized as follows:

Mrs. Dorff testified: After her reconciliation with her husband, she asked petitioner if he would drop the criminal charges against her husband, and petitioner agreed to do so. On September 14, 1970, she asked petitioner why he had not dropped the charges as he had agreed to do, and he replied, *"Well, you tell your husband to deposit $1,000 with his attorney and then I'll drop the charges."* (Italics added.) Petitioner indicated that the $1,000 was for his attorney's fee, as provided in the marital settlement agreement.

Denenberg testified: Before the criminal trial he asked petitioner if he would be willing to drop the criminal charges against Mr. Dorff. Petitioner replied in substance that *."if we would see to it that his attorney's fees were paid for the divorce . . . that he would consider dropping the criminal charges."* (Italics added.)

Friedman testified that on September 21, 1970, he telephoned petitioner, that he did not electronically record the conversation but made notes immediately upon its conclusion, and that the conversation was as follows: "[Friedman]: '. . . I'm calling because . . . I'm supposed to be defending Bob Dorff next week in a criminal trial. *I've heard rumors that you're planning to drop the charges,* is this true?' [Petitioner]: 'Yes, if he pays me the money.' [Friedman]: 'What money are you talking about?' [Petitioner]: '*Well, I was originally supposed to get a thousand dollars attorney's fees from Dorff in the divorce case but the parties have now reconciled. If Mr. Dorff will pay me $700 before the trial I'll drop the criminal charges.*' [Friedman]: 'Well, if Bob Dorff owes you money for the divorce case that's an entirely separate matter. *What does the payment of $700 have to do with the criminal charges?* [Petitioner]: '*Nothing, except that that's the only way I can make Dorff pay me now that the parties have reconciled.*' " (Italics added.)

On the other hand, petitioner testified that he never told anyone that he "would dismiss the criminal action if Mr. Dorff would pay [him] a thousand dollars." His version of his conversations with Denenberg and Friedman does not include the statements they testified he made, but even under his version it appears he made remarks which suggest he was seeking payment of his attorney's fee in the divorce action, as well as for his injuries, as a precondition to his advising the prosecution that he had "been compensated for his injuries and they can dismiss it if they want

under [Pen. Code, §] 1377 [which section permits the compromising of certain misdemeanors.]."

The $700 or $1,000 was not paid to petitioner by Mr. Dorff, and the criminal trial proceeded. At the trial Mr. Dorff was acquitted.

The local committee and board found, inter alia, that the September 21, 1970, conversation between Friedman and petitioner contained a specified colloquy, which colloquy is substantially identical to that stated by Friedman in his testimony quoted above, and that petitioner also told Denenberg that petitioner would drop the criminal charges against Mr. Dorff if petitioner's $1,000 attorney's fee was paid by Mr. Dorff. The board further found that petitioner wilfully and wrongfully attempted to use criminal proceedings in order to collect a legal fee in a civil matter.

Petitioner contends that the foregoing findings are not supported by the evidence. ■ Findings by the local committee and disciplinary board are not binding on this court, and we will weigh the evidence and pass upon its sufficiency. ■ Charges of unprofessional conduct on the part of an attorney should be sustained by convincing proof and to a reasonable certainty, and reasonable doubts must be resolved in the attorney's favor. (*Skelly* v. *State Bar*, 9 Cal.3d 502, 508 [108 Cal.Rptr. 6, 509 P.2d 950]; *Himmel* v. *State Bar*, 4 Cal.3d 786, 793, 794 [94 Cal.Rptr. 825, 484 P.2d 993].) The burden, however, is on the petitioner to show that the findings are not supported by the evidence. (*Brody* v. *State Bar*, 11 Cal.3d 347, 350 [113 Cal.Rptr. 371, 521 P.2d 107].)

Petitioner has not sustained that burden. In attacking the findings as to the content of his conversations with Friedman and Denenberg, petitioner points to his own testimony regarding what was said. ■ The above recited testimony of attorneys Friedman and Denenberg, however, differs from that of petitioner and supports the challenged findings except for immaterial details. The fact that their testimony and that of Mrs. Dorff regarding what petitioner told them contain similar statements by him tends to support their version regarding what he said. Also, as we have seen, Friedman made notes of his conversation with petitioner immediately thereafter. Furthermore, since the credibility of witnesses is in issue, we must give great weight to the action of the local committee which heard and saw the witnesses. (*Ridley* v. *State Bar*, 6 Cal.3d 551, 559 [99 Cal.Rptr. 873, 493 P.2d 105].)

■ The other challenged finding (i.e., that petitioner wilfully and wrongfully attempted to use criminal proceedings in order to collect a

legal fee in a civil matter) is likewise supported by the recited evidence. Petitioner, in arguing to the contrary, points to testimony by himself as to what occurred during a conference in chambers with the judge at the criminal trial.[3] It appears from petitioner's testimony that the trial judge asked for an explanation after commenting that he understood "there is a civil matter . . . something about attorney's fees" and that the court "is not going to be a collection agency." Petitioner informed the judge that "if this money, whatever the sum was, $500 or $700 or $1000 . . . was paid to [petitioner], [he] would represent to the District Attorney . . . that [petitioner] felt [he] had been adequately compensated . . . under [Pen. Code, §] 1377." The judge asked if petitioner had been compensated for his injury, and when petitioner replied he had not the judge said, "All right, then we will proceed."

It does not appear from petitioner's testimony that he informed the judge that the sum referred to by petitioner was for his attorney's fee in the divorce action. Other evidence that may be viewed as conflicting was received as to whether petitioner told the judge that petitioner told Friedman that the money was in part for "the divorce fee." The findings of the local committee and board differ as to what petitioner told the judge. We need not resolve that matter. Irrespective of what was said in chambers and the fact that the case then proceeded to trial, the heretofore recited evidence that was introduced at the instant proceeding shows that petitioner wilfully and wrongfully attempted to use criminal proceedings in order to collect a legal fee in the divorce action.

The next question is whether petitioner's acts involved moral turpitude (see Bus. & Prof. Code, § 6106)[4] or on some other basis warrant the imposition of discipline. The local committee concluded that those acts did not involve moral turpitude but were a violation of petitioner's oath and duties as an attorney (see Bus. & Prof. Code, §§ 6103, 6067 & 6068)

---

[3]Petitioner also points to several other matters (e.g., his telephone conversation with Friedman was initiated by Friedman). These matters do not show the finding to be erroneous.

[4]Moral turpitude has been defined as " 'conduct which is contrary to justice, honesty and good morals' " (*Arden* v. *State Bar,* 52 Cal.2d 310, 321 [341 P.2d 6], quoting from *Fall* v. *State Bar,* 25 Cal.2d 149, 160 [153 P.2d 1]), and as " 'an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man' " (*In re Fahey,* 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369], quoting from *In re Craig,* 12 Cal.2d 93, 97 [82 P.2d 442]). The concept of moral turpitude depends upon the state of public morals, and may vary according to the community or the times, as well as on the degree of public harm produced by the act in question. "To hold that an act of a practitioner constitutes moral turpitude is to characterize him as unsuitable to practice law." (*In re Higbie,* 6 Cal.3d 562, 570 [99 Cal.Rptr. 865, 493 P.2d 97].)

and therefore warranted discipline. The board drew no express conclusions. The State Bar now argues, inter alia, that petitioner's acts involved moral turpitude, and petitioner argues to the contrary.

Various oppressive methods of attempting to collect legal fees have been held to involve moral turpitude. (*Lindenbaum* v. *State Bar,* 26 Cal.2d 565, 573 [160 P.2d 9]; *McGrath* v. *State Bar,* 21 Cal.2d 737, 741 [135 P.2d 1]; see 1 Witkin, Cal. Procedure (2d ed.) pp. 211-212.) ■ The fact that the attorney may be entitled to the fee he sought to obtain or to a fee does not exonerate him. (*Lindenbaum* v. *State Bar, supra; McGrath* v. *State Bar, supra.*) In *McGrath* the attorney intentionally withheld his client's funds in an attempt to coerce payment of a fee. In *Lindenbaum* the attorney, in an attempt through fear to force the payment of his bill for legal services, made threats of action injurious to his client and another. *Lindenbaum,* in holding that the attorney's conduct involved moral turpitude, noted that his acts constituted the crime of attempted extortion.

■ Even if the acts of petitioner did not constitute attempted extortion (see Pen. Code, §§ 518-524), it is clear that his making the heretofore recited statements indicating he would drop, or consider dropping, the criminal charges against Mr. Dorff if Mr. Dorff paid petitioner the attorney's fee in the divorce action constituted an oppressive method of attempting to collect that fee[5] and involved moral turpitude. Such a method of attempting to collect an attorney's fee cannot be countenanced.

■ Petitioner also asserts, without elaboration, that "[i]f any law[s]" proscribed his conduct "they are so vague and overbroad that they fail to give lawyers notice that the conduct is proscribed. (*Rabe* v. *Washington,* 405 U.S. 313 [31 L.Ed.2d 258, 92 S.Ct. 993].)" The assertion was not made in the petition for review but instead in a letter received after oral argument. The assertion thus was untimely. (See rule 952(a), Cal. Rules of Court.)[6] Furthermore, the assertion is general in nature;

---

[5]Petitioner, of course, could not have dropped the criminal charges but he could have informed the prosecution that he was willing to have the charges dismissed. A prosecutor can move to dismiss a criminal action, and the court has discretionary authority to grant such a motion. (See Pen. Code, § 1385.) Also petitioner could have accepted satisfaction for his asserted injuries and acknowledged that fact in court, in which case the court would have discretion to stay the proceedings and order the defendant discharged. (See Pen. Code, § 1378.)

[6]Rule 952(a) provides, inter alia, that a petition to review a decision of the State Bar recommending discipline "shall specify the grounds relied on and shall be accompanied by petitioner's brief . . .," that if review is ordered the State Bar shall file a brief within a specified time, and that within a designated time thereafter the petitioner may file a reply brief. It is implicit in that rule that every ground relied upon should be stated in the petition.

petitioner points to no particular language in the statutes and rule involved in the instant charges as assertedly impermissibly vague, nor does he even specifically refer to those statutes and rule in connection with the above contention. *Rabe* involved a statute totally dissimilar to those involved here. The assertion does not sustain petitioner's burden of showing that the board's action is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c); cf. *Black* v. *State Bar,* 7 Cal.3d 676, 684 [103 Cal.Rptr. 288, 499 P.2d 968] [general allegation that the findings are not supported by the evidence does not sustain petitioner's burden].)

Several other assertions made by petitioner in the letter were not made in the petition for review and were thus untimely. Furthermore, these assertions also are not of such a character as to sustain petitioner's burden.

*Whether Petitioner Wilfully Violated*
*Rule 3 by Aiding or Abetting an Unlicensed*
*Person to Practice Law in California*

In 1969 petitioner became acquainted with William Lynas who represented to petitioner that he was admitted to practice law in New York and had practiced in Europe. Lynas was not in fact admitted to practice in New York or any state. Petitioner at all times knew that Lynas was not licensed to practice in California.

By February 1970 Lynas, who had an employment agency, obtained offices adjacent to those of petitioner and offered his services to petitioner as an assistant on matters requiring foreign contacts or knowledge of foreign law. At Lynas' suggestion, petitioner caused to be put on his law office letterhead Lynas' name followed by the words "Of Counsel." There was no indication on the stationery that Lynas was not a member of the California State Bar.

On February 17, 1970, after one Mitchell Walman was arrested in Spain and charged with attempting to smuggle narcotics into that country, his wife Ellen, accompanied by his mother, Mrs. Morris Walman, and others, came to petitioner's office.[7] On that occasion they discussed with petitioner the problem presented by Mitchell's arrest in Spain. According to Mrs. Morris Walman, petitioner said he had some

---

[7]Conflicting inferences may be drawn as to whether Ellen Walman and her companions came to see petitioner or to see William Heimbach, a private investigator in petitioner's office, who, as a former consular officer had experience in getting Americans out of jail. No finding was made regarding this matter, and the matter is not important.

other "attorneys" in his office and would like them to hear "this" also and then brought in several men including Lynas and introduced them as his "associates" and said that "Lynas was more familiar with foreign law." Petitioner, however, denied stating that Lynas was his "associate" or representing to her that Lynas was "authorized to practice law in California." It was stipulated that petitioner told the Walmans that Lynas was an attorney in New York and had practiced in Europe.[8] According to petitioner, he "just introduced the Walmans to . . . Lynas thinking he knew somebody that may be able to help them." Lynas said he knew an attorney in Europe and would attempt to contact him.

Mrs. Morris Walman testified that she and Ellen returned to petitioner's office to see him the next day and that he explained to them "Lynas would be handling our case because he knew more about Spanish law or Spanish whatever in the sense that he would be able to help us more." Petitioner, however, when asked whether he had any contact with the Walmans after the initial meeting, stated he saw them a couple of times in the hallway and made comments such as "How are things going." Petitioner also stated that he told the Walmans (apparently after the initial visit) that the attorney Lynas had contacted in Europe wanted $1,000 and that petitioner would gamble the $1,000 if it were his son. Petitioner further testified that Lynas told him that Lynas "was following up the case and . . . had gotten [the Walmans] in touch with some lawyer in Spain and that the lawyer in Spain was taking care of the thing."

Mrs. Mitchell Walman paid the $1,000 to Lynas to retain the attorney in Europe. Lynas subsequently obtained $4,000 more from Mrs. Walman. It appears from petitioner's uncontradicted testimony that he saw a document indicating Lynas sent the $1,000 to the attorney in Europe and that petitioner did not receive any of the additional $4,000 paid to Lynas.

The full extent of the services rendered by Lynas to the Walmans is unclear. There were several additional conferences between Mrs. Mitchell Walman and Lynas at which petitioner was not present. One or more of the conferences was in petitioner's suite. He denied having

---

[8]Although Mrs. Ellen Walman testified that nothing was said as to where Lynas may have been licensed to practice law and Mrs. Morris Walman gave similar testimony, the local committee and board found in accord with the stipulation that petitioner told the Walmans that Lynas was an attorney in New York and had practiced in Europe, and that finding is not challenged.

given Lynas permission to use the suite. Also, Lynas accompanied Morris Walman to Spain and introduced him to an attorney there. Mitchell Walman eventually received a prison term.

About April 1970 Lynas was arrested apparently for an offense unrelated to the instant matter. Thereafter the Walmans called petitioner when they were unable to reach Lynas, and petitioner informed them of Lynas' arrest. Petitioner testified that the Walmans then told him about giving Lynas "all this money" and that he was very "aggravated."

Both the board and local committee found, inter alia, that by his conduct petitioner "aided and abetted" Lynas to practice law in California and to receive compensation for such practice although not licensed to practice law in this state.

Petitioner contends that the board erred in finding that he "aided and abetted" Lynas to practice law in California. Petitioner asserts that he did not "aid or abet" Lynas to practice law since all he did was ask Lynas to try to find someone in Europe to assist the Walmans and that nothing Lynas did constituted the practice of law—that "assisting someone to obtain counsel in a foreign country is not the practice of law." Petitioner further asserts that referring a person to foreign counsel is protected by the First Amendment of the federal Constitution, made applicable to the states by the Fourteenth Amendment. The State Bar's position is that "Lynas's services included the unauthorized practice of law and that Petitioner aided and abetted such practice."

Rule 3 prohibits a member of the State Bar "from 'directly or indirectly' aiding or abetting the *unauthorized practice of law.*" (Italics added; see *Crawford* v. *State Bar,* 54 Cal.2d 659, 666 [7 Cal.Rptr. 746, 355 P.2d 490].)[9] The practice of law " 'includes legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured although such matter may or may not be depending in a court.' " (*Id.,* at p. 667, quoting from *People* v. *Merchants Protective Corp.,* 189 Cal. 531, 535 [209 P. 363].)

"Whether a person gives advice as to [local] law, Federal law, the law of a sister State, or the law of a foreign country, he is giving legal advice. . . . To hold otherwise would be to state that a member of the [State] Bar

---

[9]A similar proscription is in rule 3-101 of the American Bar Association Code of Professional Responsibility. Rule 3-101 provides in relevant part, "A lawyer shall not aid a non-lawyer in the unauthorized practice of law."

only practices law when he deals with local law, a manifestly anomalous statement." (*In re Roel,* 3 N.Y.2d 224 [165 N.Y.S.2d 31, 35, 144 N.E.2d 24] [app. dism. for want of substantial fed. question, 355 U.S. 604 (2 L.Ed.2d 524, 78 S.Ct. 535)].)

■ Giving legal advice regarding the law of a foreign country thus constitutes the practice of law, and the next question is whether such practice is unauthorized. Business and Professions Code section 6125 provides, "No person shall practice *law* in this State unless he is an active member of the State Bar."[10] (Italics added.)

Does "law" in section 6125 include foreign law? A similar question was presented in *In re Roel, supra,* 165 N.Y.S.2d 31. There a lawyer admitted to practice in Mexico but not in New York, maintained an office in New York and advised members of the public on Mexican law. An action was brought to enjoin him from practicing law, and the trial court, inter alia, granted the injunction. On appeal the New York Court of Appeals, in its 5 to 2 decision affirming the order, held that "law" as used in the New York code section proscribing the unlicensed practice of "law" included foreign law. The court stated in part, "Protection of the members of the lay public of our State, when they seek legal advice . . . is the basis of the requirements of licensing of attorneys by the State, and this protection must be deemed to embrace whatever kind of law or legal rights the layman seeks advice on . . . . [¶] When counsel who are admitted to the Bar of this State are retained in a matter involving foreign law, they are responsible to the client for the proper conduct of the matter . . . . Moreover, the conduct of attorneys admitted here may be regulated by our courts [citations], and dealt with when they engage in unethical practices . . . . A foreign law specialist, on the other hand, is not subject to discipline; he need not be a lawyer of any jurisdiction; he may be without good character; and his activities may not even be regulated under the present state of the law." ■ Similarly here "law" as used in Business and Professions Code section 6125 includes foreign law. (See generally A.B.A. Opinions on Professional Ethics (1967) p. 586.)

---

[10] The State Bar Act, which includes the above quoted section (see Bus. & Prof. Code, § 6000), does not regulate practice before United States courts. (*In re McCue,* 211 Cal. 57, 66 [293 P. 47]; *Cowen v. Celabrese,* 230 Cal.App.2d 870, 872-873 [41 Cal.Rptr. 441, 11 A.L.R.3d 903]; see 1 Witkin, Cal. Procedure, *supra,* p. 185.) Here, however, we are not concerned with such practice.

Also, rule 983, California Rules of Court, provides that an attorney licensed to practice in other jurisdictions who is retained to appear in a particular cause pending in a court of this state may in the discretion of the court be permitted to appear as counsel pro hac vice under certain circumstances. This rule was adopted after the occurrences here in question and in any event would have no application to those occurrences.

▮ Whether or not Lynas in fact advised the Walmans in California regarding Spanish law, it is apparent that petitioner operated so as to lead toward Lynas' so doing by introducing Lynas to the Walmans at petitioner's law office under the circumstances heretofore recited, informing them that Lynas was an attorney in New York and had practiced law in Europe, conveying to them the impression that Lynas was associated in some way with petitioner,[11] and subsequently allowing Lynas to consult with the Walmans in California without any supervision by a member of the State Bar. Petitioner thus aided Lynas to practice law within the meaning of rule 3.[12] "Aid" is synonymous with "help" (see Black's Law Dict. (4th ed.)), and one meaning of "help" is "to operate so as to lead toward or bring about" (see Webster's New Internat. Dict. (2d ed.)). ▮ The asserted First Amendment right to refer another to foreign counsel manifestly did not justify petitioner's aiding Lynas to practice law in California.

▮ The recited facts also show that petitioner knew what he was doing and intended to commit the acts. ▮ ▮▮▮ Thus his breach of rule 3 was wilful. (See *Abeles* v. *State Bar,* 9 Cal.3d 603, 610-611 [108 Cal.Rptr. 359, 510 P.2d 719].)[13]

*Discipline*

In recommending the discipline to be imposed, the board took into consideration a prior proceeding against petitioner which resulted in his public reproval in 1965. In that proceeding it was established that, after accepting a fee for certain legal services to be performed, petitioner knowingly and with the intent of misleading his client falsely represented to the client that the services had been performed.

---

[11]Irrespective of whether petitioner expressly stated that Lynas was his "associate," a disputed matter, the fact that, after the Walmans explained their legal problem to petitioner, he introduced them to Lynas in petitioner's law office and told them Lynas was admitted to practice in New York and had practiced in Europe undoubtedly conveyed to them the impression Lynas was in some way associated with petitioner.

[12]As heretofore appears, the findings also state that petitioner "abetted" Lynas to practice law in California. We need not consider the meaning of "abet" in rule 3 and whether the evidence supports the foregoing finding. As heretofore appears, rule 3 proscribes aiding "or" abetting an unlicensed person to practice law. (See fn. 2, *ante.*)

[13]Petitioner also wilfully breached rule 3 when he caused to appear on his law office letterhead the name of Lynas followed by the words "Of Counsel." "The unauthorized practice of law includes the mere holding out by a layman that he is practicing or is entitled to practice law. (Bus. & Prof. Code, § 6126.)" (*Crawford* v. *State Bar, supra,* 54 Cal.2d 659, 666.) Petitioner asserts that the matter of the letterhead was not contained in the charges. Even if it be assumed that the foregoing matter was not adequately charged and may not be regarded as a ground for discipline herein, petitioner's other misconduct heretofore discussed warrants the discipline recommended.

■ Petitioner appears to suggest that considering the prior proceeding in determining the appropriate discipline for his instant misconduct violates the federal constitutional proscription against double jeopardy (U.S. Const., Amends. V and XIV) and the doctrine of res judicata. This court has repeatedly declared that an attorney's prior record may be considered in determining the appropriate discipline for misconduct (see *Schullman* v. *State Bar,* 10 Cal.3d 526, 538 [111 Cal.Rptr. 161, 516 P.2d 865]; *Eschwig* v. *State Bar,* 1 Cal.3d 8, 18 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662]; *Simmons* v. *State Bar,* 2 Cal.3d 719, 731 [87 Cal.Rptr. 368, 470 P.2d 352]; *Herron* v. *State Bar,* 24 Cal.2d 53, 65-66 [147 P.2d 543]; *Marsh* v. *State Bar,* 2 Cal.2d 75, 78-80 [39 P.2d 403]; see also rule 29.1, Rules of Procedure of the State Bar), and it is implicit in the cited cases that petitioner's suggestion lacks merit.

■ The burden is on a petitioner to show that the board's recommendation is erroneous. (*Persion* v. *State Bar,* 9 Cal.3d 456, 461 [107 Cal.Rptr. 708, 509 P.2d 524].) Petitioner has not sustained that burden. He argues that the evidence does not sustain the charges and that we should therefore dismiss the proceeding, but, as heretofore appears, that argument cannot be upheld.

■ It is ordered that William J. Bluestein be suspended from the practice of law for six months. It is further ordered that he comply with rule 955, California Rules of Court, and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days respectively after the effective date of this order. This order is effective 30 days after the filing of this opinion.

Richardson, J., did not participate therein.

Burke, J., retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council participated therein.

Petitioner's application for a rehearing was denied January 17, 1975.